# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WHITE MARBLE LLC, a limited liability company organized in Delaware and beneficially owned by Dr. Xiaodi Hou, and WHITE MARBLE INTERNATIONAL LIMITED, a company incorporated in Samoa and beneficially owned by Dr. Xiaodi Hou, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2024-1208-PAF |
| MO CHEN, | ) ) ) | |
| Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: July 22, 2025
Date Decided: October 31, 2025

Joseph L. Christensen, Anne M. Steadman, CHRISTENSEN LAW LLC, Wilmington, Delaware; Ashley R. Altschuler, Harrison S. Carpenter, Ryan D. Konstanzer, Alexander T. Dickinson, MCDERMOTT WILL & EMERY LLP, Wilmington, Delaware; David Azar, MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC, Los Angeles, California; Richard Liu, INNOVATIVE LEGAL SERVICES, P.C.; *Attorneys for Plaintiffs White Marble LLC and White Marble International Limited*

Thomas P. Will, Elise Wolpert, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jon M. Talotta, Sean M. MacDonald, Erica Shuler, HOGAN LOVELLS US LLP, Tysons, Virginia; Matthew Sullivan, Shannon Zhang, HOGAN LOVELLS US LLP, New York, New York; *Attorneys for Defendant Mo Chen*

**FIORAVANTI, Vice Chancellor**

Two co-founders of a Delaware corporation collectively held a majority of the corporation's voting power. They later executed an irrevocable proxy and power of attorney and, at the same time, entered into a separate voting agreement. The proxy gave one co-founder the right to vote the other's shares for two years. By contrast, the voting agreement gives the same co-founder the right to direct the vote of the other's shares and specifies that it terminates only upon the parties' mutual agreement.

This post-trial decision resolves a dispute over the validity and duration of the voting agreement. The co-founder who surrendered his voting rights contends that, like the proxy agreement, the voting agreement terminates after two years. Alternatively, he seeks reformation for mistake or a declaration that the voting agreement is unenforceable due to lack of consideration, fraudulent inducement, and ethical violations by the other co-founder's counsel. The other co-founder concedes that the proxy agreement expired after two years but maintains that the voting agreement is effective until both parties agree to terminate it.

The court concludes that the parties entered into a valid voting agreement supported by consideration, that they manifested mutual assent to that agreement, and that there was neither mutual nor unilateral mistake. The court also concludes that there was no fraudulent inducement and that any alleged violations of the rules of professional conduct have no bearing on the validity or enforceability of the

agreement. The court further concludes that the voting agreement's unambiguous termination provision requires mutual agreement of the parties. Therefore, judgment will be entered in favor of the defendant.

## I. BACKGROUND

These are the facts as the court finds them after trial.[1]

---

[1] Other factual findings are contained in the analysis of the claims. Deposition testimony is cited as "(Surname) Dep."; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by docket number and the relevant section, page, paragraph, or exhibit. Citations to testimony presented at trial are in the form "Tr. # (X)," with "X" representing the name or surname of the speaker. Citations to the transcript of post-trial oral argument, Dkt. 196, are in the form of "Post-Trial Arg." After being identified initially, individuals are referenced herein by their names or surnames without regard to honorifics. No disrespect is intended. First names are used herein for clarity and without intending disrespect or familiarity. Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs. When resolving factual disputes, this decision generally gives more weight to contemporaneous evidence. *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("[T]he relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact." (citation modified)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE); *see, e.g.*, *BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record. In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents."). Dates and times are indicated in Pacific Time (UTC-7/UTC-8) for consistency, even where events occurred in the People's Republic of China. The Joint List of Exhibits records the timestamp of the first message in a text thread; subsequent messages may have been sent later. The court identified inaccuracies in certain exhibits' timestamps and corrected them using other contemporaneous exhibits in the record. Moreover, several of the exhibits are in Chinese. The parties supplied notarized English translations, yet disputes about their accuracy remain. This opinion resolves any divergences through context and close textual analysis of the documents that bear on the disputed language, read against the full record. When necessary to reflect the parties' disagreement, this opinion presents both versions.

## A. The Parties

CreateAI Holdings Inc., formerly known as TuSimple Holdings Inc. ("TuSimple" or the "Company"), is a Delaware corporation.[2] TuSimple has two classes of common stock. Class A common stock entitles the holder to one vote per share.[3] Class B common stock entitles the holder to ten votes per share and is convertible at any time into one share of Class A common stock.[4]

White Marble LLC is a Delaware limited liability company.[5] As of November 9, 2022, it held 13,367,314 shares of TuSimple's Class A common stock.[6] After transfers to trusts, White Marble LLC continues to hold 10,567,321 shares of Class A common stock of TuSimple.[7] White Marble International Limited (together with White Marble LLC, "White Marble" or the "Plaintiffs") is a Samoan entity that owns 12,000,000 shares of TuSimple Class B common stock.[8]

---

[2] JX 5 (the "Prospectus") at 39.

[3] *Id.* at 1.

[4] *Id.*

[5] PTO ¶ 11.

[6] *Id.*

[7] *Id.*; Song Dep. 209:24−210:14.

[8] PTO ¶ 12.

Xiaodi Hou ("Hou") beneficially owns both White Marble entities.[9] Hou co-founded TuSimple.[10]

Mo Chen ("Chen" or the "Defendant") is the other co-founder of TuSimple.[11] Chen beneficially owns 12,000,000 shares of TuSimple Class B common stock.[12]

## B. Factual Background

### 1. Early history and formation of TuSimple

Hou studied in China and the United States, specializing in artificial intelligence and deep learning.[13] After earning a Ph.D. in Computation and Neural Systems from the California Institute of Technology, Hou founded the startup CogTu Technologies Limited ("CogTu").[14] Sina Corporation ("Sina"), a Chinese media conglomerate, financed CogTu.[15] When CogTu exhausted its funding, Sina

[9] *Id.* ¶ 13.

[10] *Id.*

[11] *Id.* ¶ 14.

[12] Dkt. 41 ("Answer") ¶ 13.

[13] Tr. 9:10−9:20 (Hou).

[14] *Id.* at 9:21−10:2; Prospectus at 143. CogTu had built an online advertising platform that used image-recognition technologies to improve advertisement targeting. Tr. 9:21−10:2 (Hou).

[15] Tr. 10:3−9 (Hou); JX 1; Prospectus at 75, 140, 143. Sina is a private company and wholly owned subsidiary of a vehicle ultimately owned by New Wave MMXV Limited, a British Virgin Islands company controlled by Charles Chao. *See* Sina Corporation, Form 20-F (2019) at 43. "Despite the fact that a SEC filing may constitute hearsay with respect to the truth of the matters asserted therein, courts may consult these documents to ascertain

4

executive, Yunli Liu ("Yunli"), initiated discussions with Hou regarding the formation of a new venture with the involvement of another individual.[16] In 2014, Yunli introduced Hou to Chen,[17] who was also the founder and the majority owner of Hydron, Inc. (formerly known as Turingtech or Turing Auto, "Hydron"), a

---

facts appropriate for judicial notice under D.R.E. 201." *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 n.9 (Del. 1995) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (indicating that courts can take judicial notice of filings with the Securities and Exchange Commission ("SEC") (citing *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 893 (D. Del. 1991)). Sina is the parent company and controlling stockholder of Weibo Corporation, a leading social media platform in China, and Weibo Corporation's variable interest entity, Beijing Weimeng Technology Co., Ltd. ("Weimeng"). *See* Weibo Corporation, Form 20-F (Dec. 31, 2020). Chao is the chairman of Weibo Corporation's board of directors. Prospectus at 144−145. In April 2020, a Chinese state-backed investment vehicle obtained a 1% equity interest in Weimeng and special governance rights, *i.e.*, "the right to appoint a director to Weimeng's three-member board of directors, and veto rights over certain matters related to content decision and certain future financings of Weimeng." Weibo Corporation, Form 20-F (Dec. 31, 2020) at 87; Angela Xiao Wu, *Golden shares in Chinese platforms: The state as news licensor and minority shareholder*, 2 Platforms & Society 1 (2025). *See* Yulin Sun, *Golden Shares Reimagined: Decoding China's Special Management Shares* (March 20, 2024) https://ssrn.com/abstract=4765649 (describing the Chinese government's development and use of the Special Management Share ("SMS") mechanism drawing distinctions with the European golden share models), *id.* at 15 ("China's strategy of applying SMS also demonstrates its desire to tighten control over some of China's largest companies softly. . . . [T]he SMS system is designed to 'ensure that state-owned capital is always the center of the shareholding reform process, and to ensure that it adheres to the correct content orientation and business direction.'").

[16] Tr. 10:13−19 (Hou); PTO ¶ 18; Hou Dep. 49:5−22; Tr. 10:3−9 (Hou).

[17] Tr. 11:1−11 (Hou); Hou Dep. 49:2−5.

Chinese hydrogen-fueled truck manufacturing company backed by Sina.[18] In 2015, Hou and Chen co-founded TuSimple.[19]

TuSimple's stated mission was to develop software and hardware for autonomous trucking and create an autonomous freight network to make long-haul commercial trucking safer and more efficient.[20] Hou served as Chief Technology Officer ("CTO"), focusing on research and development.[21] Chen served as Chief Executive Officer ("CEO"), responsible for strategy and fundraising.[22] In its early days, Hou and Chen were the only members of the Company's Board of Directors (the "Board"), with Chen serving as Executive Chairman.[23]

---

[18] Chen Dep. 165:7−8, 166:8−11; JX 40 at 2; JX 323 at 48; Dkt. 42 ("Answer") ¶ 21.

[19] PTO ¶¶ 13−14. Hou Dep. 48:20−49:1, 50:6−13. Sina had previously extended a loan to CogTu, which was transferred to TuSimple. Tr. 10:10−12 (Hou). *See* JX 6 at 12 ("TuSimple was originally incorporated as Tusimple (Cayman) Limited, a limited liability company in the Cayman Islands, on October 25, 2016. In February 2021, the Company deregistered as a Cayman Islands exempted company and continued and domesticated as a corporation incorporated under the laws of the State of Delaware."); *see also* JX 310 at 39 (referring to the repayment of the outstanding related-party loan of approximately $3.7 million from Jinzhuo Hengbang Technology (Beijing) Co., Ltd. during the year that ended on December 31, 2021).

[20] Tr. 12:4−10 (Hou).

[21] *Id.* at 11:8−15, 12:4−10; Hou Dep. 51:21−22, 52:9−14.

[22] Prospectus at 143; Hou Dep. 51:19−21; Tr. 10:6−8 (Hou).

[23] Prospectus at 143.

Sina was TuSimple's first outside investor.[24] It invested through its affiliate Sun Dream Inc. ("Sun Dream") by purchasing Series B redeemable convertible preferred stock.[25] In April 2019, Sina's CEO, Guo Wei (also known as Charles) Chao ("Chao") joined the TuSimple Board.[26] In June 2020, Cheng Lu ("Lu") became the fourth director.[27] In September 2020, he replaced Chen as CEO.[28] That same month, Sina's Chief Financial Officer, Bonnie Yi Zhang ("Zhang"), had also joined the Board.[29]

### 2. TuSimple conducts an IPO, and scrutiny increases.

In April 2021, TuSimple conducted an initial public offering ("IPO") of its Class A common stock on Nasdaq, raising over $1 billion.[30] By that time, Sun Dream held more than five percent of TuSimple's equity and had extended convertible loans to the Company.[31] In its registration statement for the IPO,

---

[24] Tr. 10:3−9, 10:16−19 (Hou); JX 1; JX 5 at 75, 140.

[25] Prospectus at 75.

[26] *Id.* at 144.

[27] *Id.* at 143.

[28] *Id.* at 143; Hou Dep. 51:19−21; Tr. 10:6−8 (Hou). Lu holds a master's degree in business administration and has professional experience in both China and the United States. *See generally* Lu Dep. 15:11−19:10.

[29] Prospectus at 145.

[30] JX 4; JX 6 at 12, 22; Tr. 282:11−21 (Lu); Hou Dep. 50:14−19. Following the IPO, the Company's market capitalization was $8.5 billion. JX 4.

[31] Prospectus at 140, 161−163.

TuSimple disclosed that, on March 1, 2021, the Committee on Foreign Investment in the United States ("CFIUS") had requested that the Company file a notice concerning Sun Dream's holdings and that those holdings would convert into Class A common stock upon completion of the IPO.[32]

In early 2022, U.S. regulators' scrutiny of TuSimple intensified. On February 18, TuSimple entered into a National Security Agreement ("NSA") with the U.S. government.[33] The NSA sought to insulate the Board from Sina's influence. It prohibited Sina from nominating replacement directors or increasing its holdings and required the appointment of a security director and a government security committee.[34] Thereafter, Sina's board representatives—Chao and Zhang—did not seek reelection at the 2022 annual meeting.[35]

On March 3, Lu resigned as CEO and director.[36] After Lu's resignation, the Board appointed Hou as CEO and elected him to serve as the Chairperson of the

---

[32] *Id.* at 140. The submission of a "notice" refers to the formal filing under 31 C.F.R. § 800.501(b)(2), whereby CFIUS may request the parties to a transaction that raises national security considerations to file a notice outlining information on the transaction in question.

[33] JX 8 at 2−3; *see* Tr. 325:14−15 (Lu); *id.* at 202:24−203:2, 215:23:24 (Timmons); JX 517 at 9; JX 518 at 4; Chen Dep. 104:15−16.

[34] JX 8 at 2.

[35] JX 9 (referring to Chao as Cao Guowei and to Zhang as Zhang Yu).

[36] JX 10 at 2, 5−10; Tr. 28:16−20 (Hou); Hou Dep. 52:19−53:5.

8

Board.[37] In April, TuSimple announced that Chen would not stand for reelection.[38] At the 2022 annual meeting, stockholders elected five directors: Hou, Brad Buss ("Buss"), Karen Francis ("Francis"), Michelle Sterling ("Sterling"), and Reed Werner.[39] Except for Hou, the other four directors were considered independent, and none were affiliated with either Sina or Hydron.[40]

Around that time, TuSimple's business performance began to deteriorate. In April, a TuSimple test vehicle struck a highway barricade during road testing.[41] Securities class actions followed. In June, TuSimple's audit committee (the "Audit Committee"), with legal advisers from Sullivan & Cromwell LLP, launched an internal investigation into potential related-party transactions with Hydron.[42]

In September 2022, Chen grew increasingly dissatisfied with Hou's leadership and began exploring options to sell his shares.[43] But, because he was

---

[37] Tr. 28:16−20 (Hou); Hou Dep. 52:19−53:5; JX 10 at 2.

[38] JX 11 at 3.

[39] TuSimple, Form 8-K (June 13, 2022); JX 11 at 3−5; JX 12 at 11−14.

[40] *See* TuSimple, Schedule 14A (Apr. 29, 2022) at 12 ("Each member of each committee of our board of directors, except for [] Hou who sits on our government security committee only, qualifies as an independent director in accordance with the listing standards of the Nasdaq Global Select Market.").

[41] JX 513 at 26−27.

[42] JX 38 at 2−3; JX 40 at 2−3. The Audit Committee also focused on possible use of Company resources or intellectual property. Tr. 289:7−24 (Lu); JX 38 at 3; JX 40 at 3.

[43] JX 14 at 2; *see generally* JX 16.

aware of the ongoing investigation into TuSimple's ties to Hydron, which constituted material non-public information, the Company's insider trading policy prevented him from engaging in any sale.[44]

### 3. The Board terminates Hou as CEO and CTO.

By late October 2022, tensions within TuSimple had reached a breaking point. The independent directors were pressing Hou to resign. Between October 28 and 30, Hou and Chen spoke multiple times as Hou considered his options.[45] Despite the NSA's restrictions, Sina executives—Chao, Zhang, and Yunli—remained focused on TuSimple's operations and governance. The evidentiary record contains a large volume of communications during the critical time period among Chen, Chao, Yunli, and Zhang (together, the "Sina bloc")

---

[44] JX 16 at 1. Under TuSimple's Insider Trading Policy, Chen was not eligible to set up a Rule 10b5-1 "trading plan." *See* JX 17 at 24. During that same period, a former executive of TuSimple warned Chen that TuSimple was losing its key players and that its value would fall to zero if it stayed on its current path. JX 15 at 2. He urged Chen to push for Hou's removal or convert his Class B shares. JX 14 at 2. He also told Chen that three directors would support the leadership change, which would have given Chen the backing of the Board majority. *Id.*

[45] JX 18 at 4; JX 19 at 5−6; JX 20 at 4; JX 21 at 4; JX 24 at 4; JX 25 at 4; JX 27 at 4. Chen covered Hou's legal fees until November 20, when Yunli directed him to cease payments. *See* JX 203 at 4. Hydron paid part of the Gunderson legal fees incurred by TuSimple. JX 217 at 1. Neither Plaintiffs nor Defendant developed this issue through trial or deposition testimony.

discussing the Company's governance.[46] At that time, the Sina bloc did not want

Hou to resign voluntarily.[47]  Hou's continued wavering, which his wife, Amanda

_____

[46] Message threads among the Sina bloc members concerning TuSimple's governance are voluminous.  *See* JX 18 (Chao and Chen; Oct. 27, 2022, 5:19 p.m. – 5:27 p.m.); JX 22 (Yunli and Chen; Oct. 28, 2022, 6:25 a.m. – 7:15 a.m.); JX 29 (Chao and Chen; Oct. 30, 2022, at 10:34 a.m. – 12:33 a.m.); JX 32 (Chao and Chen; Oct. 30, 2022, at 6:40 p.m. – 12:00 a.m.); JX 522 (Yunli and Chen; Oct. 30, 2022, 6:40 p.m. – Oct. 31, 2022, 4:30 p.m.); JX 36 (Chen, Yunli, and another individual; Oct. 31, 2022, at 3:13 a.m. – 12:12 p.m.); JX 416 (Zhang and Chang; Oct. 31, 2022, 7:24 a.m. – Nov. 4, 2022, 7:35 a.m.); JX 37 (Yunli, Chao, and Chen; Oct. 31, 2022, 3:22 p.m. – 11:41 a.m.); JX 43 (Yunli and Chen; Nov. 1, 2022, 3:58 a.m.); JX 45 (Yunli and Chen; Nov. 1, 2022, 7:20 a.m. – 8:59 a.m.); JX 42 (Zhang, Chen, Yunli, and Chao; Nov. 1, 2022, 2:42 p.m. – 12:46 p.m.); JX 521 (Yunli and Chen; Nov. 3, 2022, 5:54 p.m. – Nov. 4, 2022, 4:11 p.m.); JX 50 (Zhang, Chen, Yunli, and Chao; Nov.  4, 2022, 7:03 a.m.  – 12:20 p.m.); JX 417 (Zhang  and Chang; Nov.  4, 2022, 9:24 a.m. – 5:01 p.m.); JX 47 (Yunli and Chen; Nov. 4, 2022, 5:54 p.m. – 3:13 p.m.); JX 48 (Yunli and Chen; Nov. 5, 2022, 3:26 a.m. – 9:43 a.m.); JX 49 (Yunli and Chen; Nov. 5, 2022, 4:06 a.m. – 10:22 a.m.); JX 523 (Yunli and Chen; Nov. 5, 2022, 4:06 a.m. – 10:22 a.m.); JX 418 (Zhang and Chang; Nov. 5, 2022, 7:08 a.m. – 8:30 a.m.); JX 420 (Zhang and Chang; Nov. 5, 2022, 9:43 a.m. – Nov. 6, 2022, 4:59 a.m.); JX 57 (Zhang and Chang; Nov. 5, 2022, 3:08 p.m. – 4:30 p.m.); JX 52 (Zhang and Chen; Nov. 6, 2022, 1:54 a.m. – 3:01 a.m.); JX 55 (Chen, Zhang, Chao, and another individual; Nov. 6, 2022, 5:51 a.m. – Nov. 7, 3:10 p.m.); JX 421 (Zhang and Chang; Nov. 6, 2022, 5:55 a.m. – 6:40 a.m.); JX 422 (Zhang and Chang; Nov. 6, 2022, 12:04 p.m. – Nov. 17, 2022, 7:36 a.m.); JX 53 (Zhang and Chen; Nov. 6, 2022, 10:24 p.m. – 11:20 p.m.); JX 526 (Zhang and Chen; Nov. 6, 2022, 10:24 p.m. – Nov. 7, 2022, 4:58 a.m.); JX 63 (Chen, Chang, Lu, Zhen, and Chao; Nov. 7, 2022, 1:12 a.m. – 3:59 p.m.); JX 59 (Chao, Chen, and Yunli; Nov. 7, 2022; 9:43 a.m. – 10:21 a.m.); JX 64 (Hou and Yunli; Nov. 7, 2022, 5:35 p.m. – 10:41 p.m.); JX 80 (Chen, Chang, Lu, Zhen, and Yunli; Nov. 8, 2022, 12:57 a.m. – Nov. 9, 2022, 3:03 p.m.); JX 65 (Chen, Chao, Yunli, and another individual, Nov. 8, 2022, 4:42 a.m. – 2:31 p.m.); JX 423 (Chang, Lu, Chen, and Chao; Nov. 8, 2022, 6:05 a.m. – 6:12 a.m.); JX 77 (Chang, Yunli, Lu, Zhen, Alice, and Chen; Nov. 8, 2022; 8:57 a.m. – 3:59 p.m.); JX 68 (Chen, Lu, Chang, Zhang, Chao, and Yunli; Nov. 8, 2022, 4:01 p.m. – Nov. 9, 2022, 4:53 a.m.); JX 105 (Chang, Yunli, Lu, Zhen, Alice, and Chen; Nov. 8, 2022, 4:02 p.m. – Nov. 9, 2022, 12:08 p.m.); JX 71 (Chen, Lu, Yunli, and another individual; Nov. 8, 2022, 5:08 p.m. – Nov. 9, 2022, 2:15 a.m.); JX 525 (Chen and Lu; Nov. 9, 2022, 12:33 a.m. – 3:08 p.m.); JX 83 (Chen and Chao; Nov. 9, 2022, 1:09 a.m. –  1:25 a.m.); JX  119  (Lu  and  Yunli;  Nov.  9,

11

Song ("Song"), and his lawyers exacerbated, soon became a source of concern and

aggravation for the Sina bloc.[48]

---

2022, 2:31 a.m. – 6:35 a.m.); JX 93 (Yunli, Chang, Lu, Chen, and Zhen; Nov. 9, 2022, 5:40 a.m. – 6:52 a.m.); JX 98 (Yunli and Chen; Nov. 9, 2022, 7:27 a.m. – 9:11 a.m.); JX 524 (Yunli and Chen; Nov. 9, 2022, 7:27 a.m. – 9:11 a.m.); JX 139 (Chang, Lu, Zhen, Chen, and Yunli; Nov. 9, 2022, 9:32 p.m. – Nov. 10, 2022, 4:08 a.m.); JX 143 (Yunli and Chen; Nov. 9, 2022, 10:19 p.m. – Nov. 10, 2022, 3:41 a.m.); JX 137 (Yunli and Zhen; Nov. 9, 2022, 10:26 p.m. – Nov. 10, 2022, 1:01 a.m.); JX 138 (Yunli and Zhen; Nov. 9, 2022, 10:26 p.m. – Nov. 10, 2022, 9:27 a.m.); JX 156 (Chang, Chen, Zhen, Lu, and Chao; Nov. 10, 2022, 12:51 a.m. – 9:27 a.m.); JX 157 (Chen and Zhang; Nov. 10, 2022 12:52 a.m.); JX 527 (Chen and Zhang; Nov. 10, 2022, 12:54 a.m. – 6:11 a.m.); JX 175 (Chen and Chao; Nov. 10, 2022, 2:40 a.m. – 10:00 a.m.); JX 186 (Chen, Chao, and Lu; Nov. 10, 2022; 4:55 p.m. – Nov. 11, 2022, 11:29 a.m.); JX 188 (Chang, Lu, Chen, and Zhen; Nov. 10, 2022, 6:32 p.m. – Nov. 11, 2022, 4:23 a.m.); JX 190 (Yunli and Zhen; Nov. 11, 2022, 12:21 a.m. – 3:22 a.m.); JX 191 (Yunli and Zhen Nov. 11, 2022, 3:27 a.m.); JX 419 (Zhang and Chang; Nov. 11, 2022, 7:40 a.m.); JX 201 (Yunli and Zhen; Nov. 17, 2022, 6:31 a.m.); JX 202 (Yunli and Zhen; Nov. 17, 2022, 6:31 a.m. – Apr. 22, 2023, 7:15 a.m.); JX 424 (Zhang and Chang; Nov. 17, 2022 7:36 a.m. – Nov. 18, 2022, 3:29 p.m.); JX 425 (Zhang and Chang; Nov. 17, 2022 9:21 a.m. – Nov. 19, 2022, 3:38 a.m.); JX 203 (Yunli and Chen; Nov. 20, 2022, 12:21 a.m. – 2:45 a.m.); JX 207 (Hou and Yunli; Nov. 23, 2022, 8:22 p.m. – 10:01 p.m.); JX 215 (Yunli and Chen; Nov. 28, 2022, 4:32 a.m. – 5:20 a.m.). Chen was not a Sina executive, but these communications and other evidence presented at trial show that he acted in close coordination with Sina's leadership. *See generally* Curtis J. Milhaupt & Wentong Zheng, *Beyond Ownership: State Capitalism and the Chinese Firm*, 103 Geo. L.J. 665, 669 (2015) ("[W]ith respect to the relationship between firms and the state, a focus on ownership alone is likely to mislead in the Chinese context, and policies pivoting on equity ownership are likely to miss the mark.); *id.* at 716 ("Because the Chinese economy under the institutions of state capitalism is highly susceptible to capture . . ., successful Chinese firms of all ownership types share important traits that distinctions based on corporate ownership alone simply do not pick up."). The Sina bloc's communications reveal a hierarchy of loyalty and respect. *See, e.g.*, JX 30; JX 42 at 7; JX 46 at 4 (referring to Chao as "Chief" or "boss"); Tr. 18:4 (Hou) (referring to Yunli and Chen as "law brothers"); Tr. 111:9−11, 111:14−21 (Song); Chen Dep. 148:17−150:1.

[47] At the same time, Chen had communicated to Hou that "Sina [wa]s not satisfied." *See* JX 22 at 4.

[48] JX 23 at 5−6; JX 29 at 7−8; *id.* at 7 (evidencing that Hou's intention was to resign voluntarily); JX 36 at 4; Lu Dep. 129:16−25, 130:13−18.

On October 30, Chen informed Chao that the Board had given Hou an ultimatum: resign that day or face termination the following day.[49] The Sina bloc, however, persuaded Hou not to resign and recruited him to support their broader strategy to remove the other four members of the then-Board.[50] On October 31, the Company announced that the Board had terminated Hou as CEO and CTO and removed him as Chairperson of the Board, although he remained as a director.[51] That same day, the *Wall Street Journal* reported that TuSimple "face[d] federal investigations into whether it improperly financed and transferred technology to a Chinese startup [*i.e.*, Hydron]."[52] In response, TuSimple filed a Form 8-K disclosing Hou's removal and that the Audit Committee was investigating potential related-party transactions.[53] The filing stated that the ongoing Audit Committee investigation had revealed that, during 2021, TuSimple's employees might have spent paid hours working on matters for Hydron.[54] Hou forwarded the *Wall Street*

---

[49] JX 28 at 5. Chao directed Chen to prepare a blank resolution in anticipation of the Board's action.

[50] The strategy is reflected in an October 31, 2022, text message between Yunli and Chen, reporting on his conversation with Hou, during which Hou agreed to: (1) wait for the Board to fire him, (2) no longer be the CEO, and (3) work with Chen and Chao to overthrow the Board at the appropriate time. JX 32 at 4; JX 522 at 3.

[51] JX 28 at 2.

[52] JX 34 at 1.

[53] Tr. 16:11−14 (Hou); JX 38 at 2, 5.

[54] JX 38 at 2. The estimated value of the paid hours was less than $300,000.

*Journal* article to his counsel at Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn") and Kirkland & Ellis LLP ("K&E").[55] Despite the article's tenor and TuSimple's filing, the Sina bloc reacted positively.[56] When Chao read the language describing the Hydron investigation, he commented: "This is nothing remarkable. It shows they have nothing." Yunli added, "Yeah, they [could] vote to fire the CEO based on this alone."[57]

After Hou's removal, the Sina bloc shifted its focus to regaining control of the Company's Board and ending the Company's obligation to comply with Nasdaq's independence requirements.[58] On November 1, Chen circulated a draft letter to other members of the Sina bloc, addressed to TuSimple's stockholders.[59] The letter called for the reinstatement of "the original members of the Company's management, including, without limitation, [] Chen, [] Lu and [] Pat Dillion [*sic*]."[60] On the same day, both Yunli and Chen communicated with Hou, who

---

[55] JX 33 at 1; JX 34 at 1. That evening, a K&E lawyer advised him not to send "the letter." JX 41 at 2.

[56] JX 37 at 5−6.

[57] *Id.*

[58] JX 39 at 5.

[59] JX 42 at 6. Chen sought guidance from Chao and Zhang on how to revise it. *Id.*

[60] JX 42 at 7. Patrick Dillon was TuSimple's Chief Financial Officer at the time of the IPO. Prospectus at 144.

continued to hold approximately 29.7 percent of the Company's voting power.[61] In those communications, Yunli and Chen emphasized that Hou bore the responsibility for the course of events that had unfolded and urged him to focus on technical matters.[62]

In the days that followed, the Sina bloc continued to strategize while maintaining close contact with Hou.[63] Chen and Yunli discussed whether Hou would agree to cede his voting rights for two years, and whether a proxy arrangement would suffice if they could not directly secure voting control over Hou's Class B shares.[64] The discussions carried on into November 5 and 6. Zhang noted that, under the NSA, the security director did not have to be independent so long as CFIUS agreed.[65] Chen sent Zhang a draft stockholder consent for the

---

[61] JX 43; JX 44; JX 323 at 3.

[62] JX 45 at 5.

[63] JX 47; JX 521.

[64] JX 521 at 4. In the same exchange, Chen observed that their most immediate obstacle lay with the three independent directors, who, in his view, had derailed a potential acquisition. *See* JX 47 at 6. Yunli wondered if Hou feared that they might "go after him." JX 521 at 4; *see also* JX 47 at 6 (translating "go after him" as "harm him").

[65] JX 50 at 6. Chao responded "[t]hat's good." *Id.*

removal of directors.[66] In a separate text message exchange,[67] Zhang shared a checklist of action items, including the documents to be signed, the signature methods, and the timing.[68] When Chen relayed to the group that Hou's lawyers had suggested amending the certificate of incorporation to prevent additional stock issuances, Chao commented that limiting issuances was contingent on Hou surrendering his voting rights.[69]

On November 7, Chen's lawyers in the Beijing office of Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP ("Gunderson") were preparing the final drafts of three documents that would execute the Sina bloc's strategy: (i) an irrevocable proxy and power of attorney; (ii) a stockholder consent to remove directors; and (iii) a voting agreement. Chen informed two Gunderson lawyers—Richard Chang ("Chang") and Zhen Liu ("Zhen")—that he would be going to their

---

[66] JX 52 at 4. Chen informed Zhang that the proxy was still being prepared. *Id.* Zhang indicated that the proposal would become effective upon the signing of enough stockholders and that delivery to the corporation's offices is required. *Id.* at 2. Chen then shared a Word file labeled "Irrevocable Proxy and Power of Attorney - White Marble." JX 53 at 4; JX 526 at 3.

[67] The Sina bloc commented on the release of a Form 8-K, which indicated that no FBI investigation was ongoing. JX 55 at 6; JX 56 at 1. In addition, Mo Chen asked whether the "T" day had been set, and Zhang responded that it had not been decided yet. JX 55 at 6. Chao then asked whether Chen's lawyers had provided any feedback, and Chen responded that "[t]hey received the instructions, and [are] now start[ing] to prepare." *Id.*

[68] JX 55 at 6; JX 79.

[69] JX 55 at 7.

16

offices and instructed them to "[g]et the files ready" for him to sign.[70] Later that day, the Sina bloc, together with Chang, Zhen, and Lu, coordinated the logistics of delivering the documents to the Company's registered office in the United States.[71] Chang then shared PDF versions of the documents with Chen, Lu, Chao, and Zhang.[72]

That same day, TuSimple filed a Form 8-K disclosing that Hou had been terminated due to "concerns about his lack of candor and transparency with the Board" and "in connection with an ongoing investigation that was initiated by the [] Audit Committee."[73] While the Sina bloc and their attorneys finalized the logistics,[74] Hou was in regular contact with his counsel and Yunli.[75]

---

[70] JX 61 at 5.

[71] JX 63 at 5−6. *See also* Lu Dep. 124:11−126:12 (indicating that it was unclear why Chen could not personally travel to the United States).

[72] JX 63 at 6−7. The PDF documents were labeled as follows: (i) "Irrevocable Proxy and Power of Attorney;" (ii) "TSP - Stockholder Consent (Removal of Directors)(Draft 1105);" and (iii) "Voting Agreement." *Id.*

[73] JX 56 at 1; JX 58.

[74] JX 70; JX 71; JX 72. Lu told Chen that the Interim Chief Financial Officer Eric Tapia would be leaving the office at 2:00 p.m. the next day and that the Company's lawyers would be working remotely. JX 77 at 16−17. Chen flagged that one open issue was "study[ing] how to make" TuSimple's former Chief Product Officer Charles Price an "independent director." JX 76 at 5; *see* Prospectus at 143, 145.

[75] JX 54 at 1; JX 60. Hou's attorney from Quinn introduced him to attorneys at the Delaware law firm of Abrams & Bayliss LLP ("A&B"). JX 51 at 1. On November 7, Song contacted Bee Choo Lim, from the Asian Infrastructure Investment Bank, to request

### 4. The November 9 meeting and execution of the documents

#### a. While Chen and the Sina bloc finalize their plans, the signed documents are transferred to the United States.

On November 8, 2022, a Gunderson attorney met with Xiao Liu ("Xiao"), one of Hou's lawyers from Quinn's China office.[76] Gunderson informed Xiao that "the business side" had agreed to sign a proxy that would also protect Hou from any appearance of retaliation against the Board.[77] Xiao said that he would show the proxy to his U.S. colleagues and that he "won't create any obstacles."[78] When Xiao mentioned that Hou wanted to issue a public statement about Hydron, Gunderson told him that Company matters took priority.[79]

That afternoon, Chang told Lu that Hou needed to sign the "voting agreement + proxy."[80] Lu noted that the signed version of the Irrevocable Proxy

---

her cell phone number as "[they] might need to move really quickly in the next couple of days" and "need to reach out to [her] to exchange information and ask [her] opinions." JX 62 at 1; Song Dep. 88:19−21. Song also indicated that there was no SEC or FBI investigation ongoing, but that the board had "voluntarily reached out to [the] SEC this morning and invited further scrutiny, as part of a measure to protect themselves" [*i.e.*, the board members]. JX 62 at 1. Song claimed that she contacted Choo to ask if she would be open to considering a board position. Song Dep. 89:8−11.

[76] JX 80 at 3; Timmons Dep. 16:6.

[77] JX 80 at 3; Timmons Dep. 16:6.

[78] JX 80 at 4.

[79] *Id.* The members to the chat also discussed the removal of the then-CEO and President, Ersin Yumer, but Chen indicated that "[t]he boss said there's no rush." *Id.* at 4−5.

[80] JX 68 at 5; JX 69 at 3.

and Power of Attorney still contained bracketed language.[81] Chang responded that they would have that fixed at Gunderson's San Diego office without affecting the signature page.[82]

Later that evening, Chen, Yunli, Lu, and Zhen discussed the final arrangements for "signing tomorrow."[83] Gunderson associate Alice Lu ("Alice") agreed to accompany Lu to Hou's home in San Diego.[84] After receiving detailed instructions,[85] she worried that a hotel lobby was too public if she needed to record the signing.[86] Zhen replied that they were going to Hou's home and that she should follow Lu's lead.[87]

---

[81] JX 68 at 5; JX 69 at 3 ("Just to clarify, the second page of the proxy has a line: [The Principal Parties agree to permit an appropriate legend on certificates evidencing the Subject Shares reflecting the grant of the irrevocable proxy contained in this irrevocable proxy and power of attorney.]"). Lu also pointed out that the signature pages with Chen's signature had no date. JX 68 at 5−6; JX 69 at 3−4.

[82] JX 68 at 5; JX 69 at 3.

[83] JX 77 at 24−26.

[84] JX 78 at 1; JX 91 at 4; JX 92 at 2. Alice booked her ticket from San Francisco to San Diego the day before and was instructed to bill her expenses to Chen's client number. JX 84 at 1; Lu Dep. 132:22−133:4.

[85] JX 97 at 1; JX 511 at 1. Alice was told that it would be "[b]est not to go to the S[an] D[iego] office" to scan the documents. JX 90 at 1−2.

[86] *Id*. at 2.

[87] *Id.*

Meanwhile, Hou spoke with his attorneys at Quinn, who informed him that they had updates and additional information regarding his options.[88] Hou also contacted K&E.[89] Xiao at Quinn then emailed Chang at Gunderson, memorializing a prior call with Zhen and Chang and noting that Hou, Chen, and the other stockholders had a common interest.[90] Xiao attached a "Stockholder Written Consent Amending TuSimple Bylaws" that the U.S. team had drafted to freeze board action, while warning that informal voting understandings among stockholders could trigger the constraints of Delaware's antitakeover statute (8 *Del. C.* § 203).[91]

That evening, Yunli informed others in the Sina bloc that he told Hou "he need[ed] to sign tomorrow" and that Hou "was a little hesitant [because] [h]e [did

---

[88] JX 85 at 1; JX 86 at 1; JX 87 at 1.

[89] JX 88 at 3−4. Hou also contacted other law firms. *See* JX 73 at 2; JX 74 at 2; JX 75 at 2.

[90] JX 89 at 1.

[91] *Id.*; JX 507. The email from Xiao explained that "DGCL Section 203 puts a 3-year moratorium on 'business combinations' with a company when a stockholder becomes an 'interested stockholder' … [*i.e.*,] owners of 15% or more of the outstanding voting stock of the corporation" and that "'ownership' [] includes 'any agreement, arrangement or understanding for the purpose of . . . ***voting*** . . . stock.'" JX 89 at 1 (emphasis in the original); JX 507. Xiao concluded his email by writing that "[a] consequence of becoming an interested stockholder is that the client would be prohibited from receiving 'the benefit, directly or indirectly … provided by or through the corporation or any direct or indirect majority-owned subsidiary.' [] Our concern is that this would mean that the client could no longer receive director compensation." JX 89 at 1; JX 507.

not] know the specific details."[92] But once Yunli assured him that the existing board would be dissolved if he cooperated, Hou "suddenly got excited and agreed to proceed."[93] Consistent with Yunli's account, at 11:34 p.m., Hou texted Lu that he had just spoken to "Chief [Yunli]."[94] After confirming that Lu was going to be in San Diego the following day, Hou shared his home address.[95] Hou then added: "let's do it. I took the personal risk I talked about this afternoon. After all, I don't have any deals. So even if being arrested, it would be only a couple of days "[96]

That night, an unnamed courier left Hong Kong with documents that Chen had signed earlier that day.[97]

Overnight into November 9, Hou remained in contact with his lawyers at Quinn.[98] Shortly after midnight, Xiao asked Gunderson for the prepared

_____

[92] JX 98 at 4.

[93] *Id.*

[94] JX 119 at 15−16; JX 340 at 2; Lu Dep. 144:22−25.

[95] JX 119 at 15−16; JX 340 at 2. One of Hou's attorneys from Quinn testified that he was aware that a meeting would take place on November 9, but did not know that the agreements would be discussed. Timmons Dep. 35:15−24. Perhaps this attorney was not aware of that fact, but other Quinn attorneys certainly were.

[96] JX 119 at 15−16; JX 340 at 2. *See also* JX 525 at 3 (Chen to Lu: "Wishing you all the best!").

[97] JX 65−66; Lu Dep. 120:1−6.

[98] JX 99 at 1.

paperwork.[99] Quinn told Hou that they had been speaking with Chen's attorneys at Gunderson and wanted to discuss next steps.[100] At 2:04 a.m., Chang at Gunderson sent Quinn three PDF documents labeled as follows: (i) "Voting Agreement;" (ii) "Irrevocable Proxy and Power of Attorney - White Marble;" and (iii) "TSP - Stockholder Consent."[101] The version of the Irrevocable Proxy and Power of Attorney sent to Hou's counsel contained no bracketed language.[102]

At 3:21 a.m., Hou asked Quinn to share "the proxy terms from the other side so [he could] review the specific terms and content."[103] Quinn forwarded Chang's email and the three attachments.[104] The terms of the draft Voting Agreement and the draft Irrevocable Proxy and Power of Attorney stated that the two instruments would terminate only by written mutual agreement of White Marble and Chen.[105]

---

[99] JX 106 at 1 (bearing the subject line "Call just now"); JX 109 at 1.

[100] JX 115 at 1; Hou Dep. 194:8−197:2, 200:16−202:4 (acknowledging the documents' transmittal but claiming that "no one at Quinn told [Hou]" about the prior conversations with Chen's lawyers).

[101] JX 109 at 1; JX 110; JX 111; JX 112.

[102] JX 110 at 2.

[103] JX 121 at 1.

[104] JX 122 at 1; Timmons Dep. 33:14−19.

[105] JX 123 at 2 § 3.1; JX 124 at 2; *see also* JX 127 at 2 § 3.1; JX 128 at 2.

At 7:44 a.m., a Quinn attorney asked Hou to "[p]lease call me when [yo]u can" and later requested additional information about Hou's Class B shares.[106]

### b. Hou signs the documents.

On the morning of November 9, 2022, Lu flew from Las Vegas to San Diego.[107] Once he arrived in San Diego, he met with Alice and the pair drove to Hou's home, where they presented him with the documents for signature.[108] Throughout the visit, Alice live-messaged the Gunderson team to report developments.[109] Other contemporaneous communication took place between Yunli and Lu.[110] Hou had asked to speak with Yunli, who passed that information along to Lu at 11:05 a.m.[111] At 12:08 p.m., Alice asked if anyone could join a call because "[Hou] [wa]s trying to go over the docs one by one and is looping in other

---

[106] JX 116 at 2. At trial, Hou, Song, and their attorneys tried to refute that they had connected after Gunderson shared the draft documents and before the signing. Hou Dep. 194:8−197:2, 209:18−210:2, 236:14−237:1; Song Dep. 172:1−8, 172:12−13; Timmons Dep. 34:6−18. That testimony is not credible. *See, e.g.*, Lu Dep. 149:14−18.

[107] Lu Dep. 41:1−6, 52:11−12; Tr. 311:16−21 (Lu).

[108] Tr. 29:10−14 (Hou); Song Dep. 102:21−24, 106:12−20, Lu Dep. 119:14−17, 132:12−15, 139:10−11, 139:20−21, 142:19−21. At trial, Lu recounted that the reason for his involvement at that stage was his planned return as CEO since "it was important for someone to help facilitate the signing, document delivery, and to hopefully ensure [a] relatively smooth transition." *Id.* at 127:10−21.

[109] *See* JX 90 at 5−33.

[110] JX 119 at 18.

[111] *Id.* at 12−20.

lawyers to challenge this plan in general."[112] Afterwards, Yunli and Lu had a 20-minute call.[113]

At 12:35 p.m., Alice reported that "[Hou] sa[id] the term of the proxy was agreed to be two years but that [was] not reflected in the doc."[114] At 12:54 p.m., Alice added that "[t]hey want two years and they were on the phone with [Yunli, the Sina executive] who confirmed it should be two years so this is the only sticky point."[115] At 12:57 p.m., Yunli texted Lu: "[t]wo years for that one," referring explicitly to a single instrument—not both documents.[116] In fact, Alice later reported that Song called Quinn "to go over the voting agreement as well."[117] Alice then relayed that Quinn had warned that before signing and filing the documents,

_____

[112] JX 90 at 5.

[113] JX 119 at 18; Song Dep. 121:17−122:22.

[114] JX 90 at 6; *see also* JX 132 at 1.

[115] JX 90 at 6; *see also* JX 132 at 1; Song Dep. 131:2−3.

[116] JX 119 at 19.

[117] JX 90 at 8; *see also* JX 133 at 1; Lu Dep. 133:24−25 ("Quinn [] was on the phone at [] Hou's house"); *id.* 145:12−25, 146:12−149:12, 150:13−16. Despite the contemporaneous evidence of Hou and Song's communication with their counsel during the November 9, 2022, meeting, at trial, they took the implausible position that no such communication occurred. *See* Song Dep. 110:13−23, 116:16−117:9. Song also deleted all telephonic records and text messages dated November 9, 2022, from her phone. *See* Hou Dep. 207:23−209:16 (indicating that "[t]hat [was] the moment when [Hou] talked to [the Quinn attorney] about the proxy" but later retracting that testimony); *id.* 211:7−17, 252:9−254:19; Song Dep. 117:10−121:16, 124:23−126:11, 140:1−12, 148:7−152:14. The court finds that testimony not credible.

Hou should be prepared for a potential lawsuit by the four soon-to-be-removed directors, including a motion for entry of a status quo order.[118]

### i.      The signing and the video

At 1:13 p.m., Alice wrote in the Gunderson group text thread "he's signing" and confirmed that they signed the documents as presented.[119] But Hou wanted to memorialize the limited duration of the proxy. So with Lu and Alice present, he recorded a video explaining his understanding. The video was played at trial. The transcript reads as follows:

> Hou: So, for today's date, it is November 9th, 2022. And I have signed an irrevocable proxy and power of attorney, and according to my understanding, this irrevocable proxy and power of attorney's duration is for two years, which means that it will expire on November 9th, 2024. That's my understanding, Cheng, is that your understanding as well?
>
> Lu: It is. I concur. Okay.
>
> Hou: And the second matter is that the action by unanimous written consent of the board of directors of TuSimple Holdings Inc. We would like to amend this board resolution by adding another clause of appointing me, Xiaodi Hou, as the CTO of the Company condition[ed] on the completion of the internal investigation. Is that yours?
>
> Lu: Yes. I concur.
>
> Hou: Okay. Thank you.[120]

_____

[118] JX 90 at 12; *see also* JX 134 at 1.

[119] JX 90 at 15−16. *See also* JX 100 (recording Hou while signing the documents).

[120] JX 90 at 15−17; JX 101; *see also* JX 135 at 1; JX 136 at 1; JX 144 at 1.

Hou made no mention of the Voting Agreement in the video. Alice reported to the Gunderson team chat on the substance of the video recording and added that she would "go get [Chen]'s signature."[121] The documents with Chen's wet signature had arrived in Los Angeles, where Hank Liu, an employee of TuSimple, collected them and later handed them to Alice in San Diego.[122] Later that day, Yunli sent Lu a draft letter addressed to the Board.[123] The letter criticized the Board's actions, urged Chen's return as Executive Chairman, sought Lu's reinstatement as CEO, and proposed that Hou return in a technical role after the investigation.[124]

### c.     The fully executed versions of the documents.

Multiple communications from November 9 corroborate the shared understanding that the Irrevocable Proxy and Power of Attorney would carry a two-year duration. Chen wrote that they might "sign a side agreement" to specify the two-year term.[125] Hou and Song then sought out Chen and the Gunderson

---

[121] JX 90 at 17; *see also* JX 94 at 1.

[122] Lu Dep. 119:25−120:24; JX 66; JX 90 at 5.

[123] JX 119 at 21.

[124] *Id.* It is unclear whether the letter was delivered to the Board.

[125] JX 105 at 20.

lawyers.[126] Zhen at Gunderson proposed sending the proxy to Hou first.[127] Zhen, the Gunderson lawyer, shared that Hou's lawyer "[wanted] to synchronize with [her]."[128] Later, Zhen told Lu there was no need to send a new proxy because they would revise the PDF to reflect the two-year term and ensure that the hardcopy to be delivered the next day was "also valid for two years."[129]

Hou continued conferring with counsel at K&E[130] and Quinn, which circulated other Word versions of the three documents.[131] A Quinn lawyer later sent Song a message joking that he hoped Hou was "a better cook than a negotiator," adding that he "understood the situation."[132] That same day, Hou's lawyers from three different firms conferred on the draft Voting Agreement and the irrevocable proxy and its implications.[133]

_____

[126] JX 105 at 21.

[127] *Id.*

[128] *Id.* at 23; *see also* JX 140 at 2; JX 162 at 4. Zhen later referred to her involvement with Hou as "feeding the baby ." *See* JX 137 at 2; JX 138 at 2; JX 142 at 6.

[129] JX 142 at 6−7.

[130] JX 147 at 1.

[131] JX 148 at 1; JX 149 at 1; JX 150; JX 151; JX 152. The Word versions are withheld as privileged.

[132] JX 154 at 2.

[133] JX 222 at 2; JX 225 at 4−5.

That evening, Alice circulated to Lu and the rest of the Gunderson team the fully executed copies of: the Irrevocable Proxy and Power of Attorney (the "Irrevocable Proxy");[134] the Voting Agreement (the "Voting Agreement");[135] a written consent of the stockholders removing Buss, Francis, and Sterling;[136] a written consent of Hou as the sole director appointing Lu and Chen to the Board;[137] and a unanimous written consent of the Board removing Yumer as CEO and President, and appointing Lu as the CEO and Chen as Chairman (the "Board Unanimous Written Consent").[138] Alice noted that "the Irrevocable Proxy [] ha[d] been updated to reflect the two-year term as requested by [Hou]."[139] The updated Irrevocable Proxy stated that it would remain in effect "until the earlier to occur of (i) the two-year anniversary of the date of this irrevocable proxy and power of attorney and (ii) mutual agreement of both [Chen] and [Hou] in writing."[140] By

---

[134] JX 164 at 1; JX 165.

[135] JX 164 at 1; JX 169.

[136] JX 164 at 1; JX 168.

[137] JX 164 at 1; JX 167.

[138] JX 164 at 1; JX 166.

[139] JX 164 at 1.

[140] *Id.* at 3; JX 165 at 2.

contrast, the Voting Agreement was unchanged, and the executed Board Unanimous Written Consent did not provide for Hou's return as CTO.[141]

Around the same time, Xiao, the Quinn lawyer, told Gunderson that Quinn and co-counsel had "suggestions regarding the shareholders' actions (and underlying agreements)."[142] Shortly after, Gunderson sent Lu the fully executed PDF copies of the Irrevocable Proxy and the Voting Agreement "for [Hou]'s record."[143]

That evening, Hou and his counsel discussed the next steps.[144] At 7:51 p.m., Quinn convened an urgent call with Hou, A&B, Olshan Law, and Chang from Gunderson.[145] The call lasted about 40 minutes.[146] Among the topics of discussion were the "voting agreement [and] the irrevocable proxy."[147] After that call, Hou

---

[141] JX 164 at 21; JX 166 at 1−2.

[142] JX 183 at 1.

[143] JX 171 at 1 (attaching two documents labeled "Irrevocable Proxy and Power of Attorney 11-9-22 (rv).pdf" and "Voting Agreement 11-9-22.pdf"); JX 172 at 1; JX 173; JX 174.

[144] JX 141 at 1; JX 155 at 1.

[145] JX 177 at 1 (the subject line read "[c]all re TuSimple--URGENT"); JX 178 at 1; JX 180 at 1; JX 181 at 1.

[146] *See* JX 222 at 2 (November 9, 2022, time entry for .70 hours ("Cal[l] with client, Quinn and corporate team re TuSimple")).

[147] *Id*. (next attorney time entry for November 9, 2022); *see also* JX 225 at 4−5 (November 9, 2022, time entry for 9.10 reflecting "multiple communications with [A&B], Olshun, Gunderson, QE team and client re various issues relating to strategy," and time entry for

wrote the following message to one of the Quinn lawyers who had participated: "Thanks Brian. I think the message has been delivered. I really appreciate your ownership and professionalism. The situation is a bit awkward now. Sorry for giving you the extra handcuffs in this case."[148] At 11:54 p.m., Zhang from K&E wrote to Hou "If you need anything, just let me know."[149]

Overnight, Chen told Zhang that Hou had signed.[150] The Sina bloc also exchanged messages about the biographical information to be included in the Form 8-K,[151] and the Gunderson lawyers reminded each other to update the draft Schedule 13D "about the two years."[152]

---

5.50 reflecting "confer[ring] with team regarding [] Chen['s] proposal; confer[ring] further with team regarding next steps; review[ing] legal analysis from Dechert; review[ing] legal analysis from A&B" and that there were "miscellaneous conferences with client regarding status and consents."); JX 225 at 5 (November 9, 2022, time entry for 1.60 indicating "[c]alls with [] Chang and [Zhen] [at Gunderson].").

[148] JX 179 at 2. The following morning at 10:30 a.m., the same Quinn attorney texted Hou as follows: "Please keep us posted on any developments today. Was the notice delivered? I will be shocked if [the ousted directors] hand over the keys without a fight. We are standing by." *Id.*

[149] JX 195 at 3.

[150] JX 527 at 3.

[151] JX 156 at 6−8.

[152] *Id.*

## 5. The Company's new governance

On November 10, 2022, Lu reported that the Company had confirmed the termination of four directors.[153] The Company filed a Form 8-K disclosing that, effective that day, the Board changes left it noncompliant with Nasdaq rules on board and committee independence.[154] Hou forwarded the filing to Quinn, commenting, "[l]ooks like it has been smooth so far."[155] When Yunli asked Zhen from Gunderson if Hou had gotten the "2-year supplement," Zhen confirmed that it was in the proxy.[156] Separately, Lu told James Mullen ("Mullen"), TuSimple's former Chief Administrative Officer and General Counsel, that Hou's voting rights had been taken from him, acknowledging the optics were "not great."[157] Mullen replied: "So now Founder in Beijing who founded Hydron has full controlling shares. Yeah, I can see why you say the optics aren't great."[158]

On November 11, the Company filed a Form 8-K announcing the four director removals and the election of Chen to the Board as Executive Chairman,

---

[153] JX 186 at 6.

[154] JX 182 at 2.

[155] JX 189 at 1.

[156] JX 191 at 2.

[157] JX 193 at 2; Tr. 295:14−15 (Lu); Lu Dep. 220:16−18.

[158] JX 193 at 2.

and the appointment of Lu as CEO.[159] That same week, Hou, who remained as a director, began requesting details of the Company's arrangements with Lu and signaling concern about the scope and terms of Lu's compensation.[160] Chen was evasive, replying that Chao, Sina's CEO, had handled the decisions around Lu's salary.[161]

On November 14, Gunderson sent Chen a draft Schedule 13D,[162] which was finalized and filed the next day. The Schedule 13D's Item 3 described a "Proxy Voting Arrangement" under which White Marble authorized Chen to vote all White Marble's shares, and stated the arrangement remained "in effect until the earlier to occur of (i) the two year anniversary of the date of the Irrevocable Proxy and (ii) mutual agreement in writing to terminate the Irrevocable Proxy and the Voting Agreement."[163] It contained the following disclaimer:

> The foregoing description of each of the Voting Agreement and the Irrevocable Proxy does not purport to be complete and is qualified in its entirety by reference to, respectively, the complete text of the Voting Agreement, which is filed as Exhibit 99.2 hereto, and the

---

[159] JX 176. The filing formalized the changes contemplated in the stockholder written consent executed two days earlier.

[160] JX 207 at 4; JX 205 at 4; JX 206; JX 208; JX 209; JX 210 at 4.

[161] JX 210 at 4; Lu Dep. 79:17−85:18 (recounting multiple meetings with Chao and Zhang over TuSimple's "future," including its board composition).

[162] JX 197 at 1.

[163] JX 198 at 8, Item 3.

complete text of the Irrevocable Proxy, which is filed as Exhibit 99.3 hereto.[164]

The Company's November 16 Form 8-K described the duration differently from that of Chen's Schedule 13D. It represented that the Irrevocable Proxy would expire on the earlier of two years or a mutual written agreement, and the Voting Agreement would terminate "upon mutual agreement among [] Chen and [White Marble]."[165] The same is true for the December 16 Schedule 14C.[166]

The November 10 disclosures drew media attention, but internal messages show the Sina bloc was unfazed. For example, a *Forbes* article titled "Robot Truck Developer TuSimple At Risk Of Nasdaq Delisting After Founders Fire Its Board" prompted a celebratory reaction.[167]

---

[164] *Id.*

[165] JX 199 at 2. The same Form 8-K disclosed the termination Yumer. *Id.* at 3−11. Meanwhile, Lu and Mullen discussed Board candidates and the Company's path forward. JX 200. They lamented that TuSimple had "pissed off a lot of people this past year," calling it "beyond a shame[,] [a]bomination[,] [and] despicable." *Id.* at 2−3. When Lu said that the Company "got to go back on being a software technology company," Mullen responded "[n]ot entirely sure what you all mean by that. But no doubt the tech needs to be the top focus." *Id.* at 3.

[166] JX 227.

[167] *Compare* Alan Ohnsman, *Robot Truck Developer TuSimple At Risk Of Nasdaq Delisting After Founders Fire Its Board*, Forbes (Nov. 11, 2022) https://www.forbes.com/sites/alanohnsman/2022/11/10/robot-truck-developer-tusimple-at-risk-of-nasdaq-delisting-after-founders-fire-its-board/, *with* JX 201 at 2 (Zhang's message to Yunli: " Mission accomplished! You played the most important role and then just waved your sleeve and left. ").

In the days that followed, Hou continued to engage with his counsel and circulated the executed documents.[168] Chen told Yunli at Sina that Hou "still want[ed] to control the [C]ompany" and to obstruct Lu's leadership.[169] Hou told his lawyers that Chen and Lu's roadmap was: "1. assemble the new board, 2. distribute stock dividend, [and] 3. sell the company."[170] In fact, Lu and Mullen weighed the feasibility of a sale, with Mullen urging the elimination of Class B shares and speed.[171] Lu replied that divesting China was necessary and confirmed that TuSimple China still operated.[172]

---

[168] On November 27, 2022, Hou emailed the Irrevocable Proxy and Power of Attorney and the Voting Agreement to an attorney at McDermott Will & Schulte LLP ("McDermott") with subject "Proxy agreement." JX 211 at 1; JX 212; JX 213; JX 214. As reflected in McDermott timesheet, Song had reached out to McDermott already on November 24, 2022. *See* JX 519 at 3. McDermott scheduled a call with Hou and Song for November 29. *Id.*

[169] JX 215 at 4.

[170] JX 216 at 1.

[171] JX 220 at 1. Mullen warned that cash would erode, peers would catch up, and no partner would engage with Hou and Mo in the mix. *Id.* He added that Nasdaq was pressing and that he read the proxy to mean "Mo has to agree to return the voting shares to [Hou] for the next 2 years," concluding, "Window is short." *Id.*

[172] *Id.* at 2. Accordingly, on December 21, 2022, TuSimple disclosed that the Board had authorized a broad restructuring plan focused on cost reduction, which contemplated global employee headcount reduction by 25%. TuSimple, Form 8-K (Dec. 21, 2022); JX 261 at 5−6. *See also* JX 261 at 6:

> Over time, the Board examined the possibility of selling TuSimple China and retaining TuSimple U.S. and vice versa. In late 2022, TuSimple disclosed that most of the cost reductions it had implemented to date had been made

On January 17, 2023, Song, referring to the White Marble entities, emailed Quinn to "[s]trategize on [Hou]'s holding company's reorg, and stock liquidation."[173] Song had also transmitted the Voting Agreement and the Irrevocable Proxy to Hou and her banker at JP Morgan Chase & Co. ("JP Morgan") because they "were trying to sell [their] shares."[174]

_____

with respect to TuSimple U.S. because selling TuSimple China was being considered. . . ("[T]he Company continues its plan to explore strategic alternatives for its Asia business, including a divestiture."). In March 2022, TuSimple announced that it was exploring possible transactions and partnerships for its APAC businesses, but at that time, it did not seek to sell them.

[173] JX 231 at 1. The record is replete with evidence of Song's direct participation in the negotiations before signing, during the November 9, 2022, meeting, and in devising a litigation strategy afterwards. Timmons Dep. 23:10−14; *id.* at 25:9−14 ("[W]e, Quinn [], represents [] Hou . . . Amanda, his wife, has been involved from the very beginning in the engagement, in the sense that she has been facilitating communications between us."). Song's centrality was also known to all the individuals who are involved in the facts that led to this litigation. *See* JX 23 at 6; JX 28 at 5 (Chen telling others that "H[ou's] wife called [him] today and told [him] that she wanted to forcefully fire the director today."); *see also* JX 154 at 2.

[174] Tr. 195:16−18 (Song). A JP Morgan representative responded, summarizing her interpretation of the mechanics of each document. JX 232. She indicated that the proxy vested voting rights in Chen and "in a way it supersedes the voting agreement" because Chen could "take any actions for [White Marble's] shares" and that the voting agreement provided only specific enforcement, so a breach might be irreversible once a vote occurred. *Id.* She added that "[t]his could work in [White Marble's] favor, except the proxy gives [] Chen voting power over [White Marble's] shares." More generally, this suggests that Song was devising a litigation strategy to liquidate White Marble's shares.

### 6. Hou resigns from the Board.

Hou remained a director until March 8, 2023, when he resigned.[175] In a social media post, he explained his decision and criticized management's direction and the Company's investigation into him.[176] That month, Song circulated to Quinn a video and an article from TuSimple China touting operational stability and a 600-employee headcount.[177] By April 3, Lu was considering delisting and restructuring as preliminary steps to ease CFIUS pressure and potentially "giv[ing] up B shares."[178] But Zhen, a Gunderson lawyer, pushed back, citing the risk of a hostile takeover.[179] Lu noted to Mullen that the "super voting ha[d] a sunset period, but [in] reality . . . [Chen would] not give back [] B share[s] to [Hou]."[180]

On July 6, Song asked Quinn and A&B about the conversion of Class B shares and the validity of the Irrevocable Proxy and the Voting Agreement.[181] In late July, Hou founded Bot Auto, another company in the space of automated truck

---

[175] Hou Dep. 53:6−14. The Company reported the resignation the next day. JX 515.

[176] JX 520.

[177] JX 235 at 1−2.

[178] JX 237 at 1−2.

[179] *Id.* at 2−3.

[180] *Id.* at 7.

[181] JX 239 at 1; JX 240; JX 241; JX 242. The record includes only an email with the subject line: "[privileged and confidential] Class B stock conversion and validity of the proxy/voting agreement." JX 239. A&B's response is not included in the record as evidence because Plaintiffs withheld it on privilege grounds. *Id.*

driving.[182] TuSimple's September 7 Form 10-K reiterated that the Irrevocable Proxy would last up to two years, and the Voting Agreement would terminate only by mutual consent.[183]

In December, a representative of Innovative Legal Services ("Innovative"), engaged by Hou, asked Gunderson to confirm their understanding that the Irrevocable Proxy and the Voting Agreement deprived Hou and Song of any voting power and vested voting in Chen alone.[184] Chang agreed that Innovative's reading was consistent with Gunderson's view.[185] Innovative then demanded that the Company retract statements to JP Morgan treating Hou as an affiliate and keeping the trading window closed, asserting that Hou and Song had "neither voting power nor any decision-making authorities associated with the [s]hares."[186] JP Morgan responded that the Company still viewed Hou as an affiliate, the trading window remained closed, and that it would not process the sell instructions.[187]

---

[182] Tr. 55:15−18 (Hou); *id.* at 168:3−9, 169:14−16 (Song). At trial, Lu testified that Hou had registered a company domain called "Bot Auto" in December 2022, and that Bot Auto is "a direct competit[or], Level 4 self-driving trucks," and that "over 40 employees that used to work at TuSimple are now at [Bot Auto]." Tr. 325:8−14 (Lu).

[183] JX 245 at 111. The same language appeared in the definitive proxy dated October 30, 2023. JX 252 at 18.

[184] JX 253 at 2.

[185] *Id.* at 1. Two days later, Chang told JP Morgan that "Chen ha[d] voted." JX 258 at 1.

[186] JX 256 at 1; JX 254 at 1. *See also* JX 255.

[187] JX 259 at 1.

### 7. The 2024 developments

On January 17, 2024, TuSimple filed a Form 8-K announcing its intention to voluntarily delist its common stock from Nasdaq and terminate its registration with the SEC.[188] By then, Hou and Song were already coordinating a litigation strategy with counsel, including a "possible [V]oting [A]greement challenge."[189]

In April, Lu emailed the Compensation Committee proposing a retention package and referring to the impending end of the two-year agency arrangement between Chen and Hou, the risk of activism, and management's low ownership.[190] On August 22, Lu executed an amended and restated employment agreement and a severance and change in control agreement.[191]

Public scrutiny intensified over the summer. On July 8, "Concerned Shareholders" sent a letter criticizing management and raising concerns about potential self-dealing.[192] A follow-up letter arrived on July 30.[193] On August 2, Hou emailed directors Zhen Tao and Albert Schultz regarding several matters: the

---

[188] TuSimple Holdings Inc., Form 8-K (Jan. 17, 2024); JX 262.

[189] JX 265 at 3−7; JX 270 at 1.

[190] JX 274 at 13. Chen instructed that there was "[n]o need to reply." JX 274 at 12−13; *see also* JX 275 at 1.

[191] JX 283; JX 284; JX 285; JX 286; JX 287; JX 288.

[192] JX 276.

[193] JX 277; JX 278; JX 279.

July 8 letter, the removal of a temporary restraining order restricting transfers to China, the $189 million federal securities class action settlement, and the Audit Committee's independence.[194] Schultz replied on August 13 that the Board had authorized outside counsel at Skadden, Arps, Slate, Meagher & Flom LLP to investigate the relevant factual and legal issues.[195]

Around the same time, the Company announced a pivot into generative artificial intelligence for animation and video games.[196] In a September 2024 press event, Lu and Chen unveiled an Artificial Intelligence Generated Content strategy, dismissed negative media reports as "false lies,"[197] and emphasized cost-cutting measures, regulatory pressures, delisting, and a shift toward licensing and patent monetization, highlighting the cash on the balance sheet and headcount reductions.[198] Chen explained that Hou's proxy was designed to last only two years and that it was about to expire.[199] Chen suggested that Hou might be driving some negative coverage[200] and framed treasury movements across jurisdictions as lawful

---

[194] JX 294 at 1−2.

[195] *Id.* at 1.

[196] JX 280; JX 301 at 2.

[197] JX 301 at 1.

[198] *Id.* at 6, 10−11, 13, 15; JX 303 at 9.

[199] JX 301 at 16, 18.

[200] *Id.* at 26−27.

corporate allocations.[201] Both Chen and Lu tied the business model change to regulatory scrutiny[202] and confirmed renewed hiring in China.[203] Chen also acknowledged that TuSimple and Hydron shared personnel.[204]

From early September, Song advanced Hou's strategy.[205] She engaged Okapi Partners, a provider of proxy solicitation and investor response services, and began a board candidate search focused on turnaround and liquidation experience.[206] The Company released its definitive proxy on November 8.[207] On November 12, Hou texted Song a screenshot from the "Voting Agreement" section highlighting the sentence "the Voting Agreement remains in effect" and commented, "A thief is still a thief."[208] On November 13, Song emailed the proxy services firm Broadridge Financial Solutions, Inc. about the information sharing and security protocols to be followed for shares held by White Marble to limit

_____

[201] *Id.* at 33; JX 303 at 40−41.

[202] JX 301 at 11, 38; JX 303 at 45.

[203] JX 301 at 9.

[204] *Id.* at 5.

[205] JX 292; JX 299.

[206] JX 295; JX 296 (forwarding an email titled "proxy address attempted theft"); JX 297 at 1; JX 298 (attaching the shareholder July 30, 2024 letter).

[207] JX 309.

[208] JX 311 at 3.

Chen, Gunderson, and Skadden's involvement in the proxy process.[209] On November 15, Hou wrote to counsel: "I have some ideas against Sina. Let's chat tonight."[210] On November 25, Hou sent a letter to the Board, blaming Chen and Lu for the 91% stock price collapse and the unapproved business model change.[211] The letter further referred to Hou's legal actions to restore his voting rights and urged liquidation with pro rata distribution.[212]

### C. Procedural History

Hou, through White Marble, filed a verified complaint for declaratory judgment (the "Complaint") on November 22, 2024, along with a motion to expedite proceedings and a motion for a temporary restraining order.[213] The Complaint named both the Company and Chen as defendants.[214] On December 13, 2024, the court entered a status quo order (the "Status Quo Order").[215] The Status Quo Order allowed the 2024 annual meeting to proceed but restricted the

---

[209] JX 314 at 1. The email stated, in part: "No third party—including TuSimple's legal team, shareholder, proxy holders, **Mo Chen**, his attorney **Richard Chang** . . .— has authorization to access or manage the proxy info of **White Marble LLC** and **White Marble International**."

[210] JX 315 at 3.

[211] JX 321; JX 322.

[212] JX 321 at 3.

[213] Dkt. 1 ("Compl.").

[214] *Id.* at 1, ¶¶ 15−16.

[215] Dkt. 26.

41

Defendant and the Company from taking major corporate actions without approval, and suspended voting of the disputed shares outside the meeting until the court's determination of who controls the shares at issue.[216]

On January 6, 2025, White Marble filed a first amended verified complaint for declaratory judgment (the "Amended Complaint"), which is the operative complaint.[217] The Amended Complaint no longer names the Company as a party to these proceedings. The Amended Complaint asserts two counts.[218] The parties agreed to expedited proceedings with respect to Count I.[219] The Plaintiffs seek a declaratory judgment that White Marble is entitled to vote its shares in the Company and Chen has no rights to vote those shares, that the parties' voting arrangement expired on November 9, 2024, or that the agreement is invalid and unenforceable. Count II asserts a claim for breach of fiduciary duty against Chen. On January 21, 2025, Chen moved to dismiss Count II of the Amended Complaint.[220] Count II of the Amended Complaint is not the subject of these expedited proceedings.

---

[216] Dkt. 26.

[217] Dkt. 34 ("Am. Compl.").

[218] *See id.* ¶¶ 144−221.

[219] Dkt. 41.

[220] Dkt. 40.

The court held a two-day trial, followed by post-trial briefing and argument.[221]

## II.  ANALYSIS

### A.  Legal Standard

The Declaratory Judgment Act authorizes Delaware courts to "declare rights, status and other legal relations whether or not further relief is or could be claimed." 10 *Del. C.* § 6501. A party "may have determined any question of construction or validity arising under [a] contract . . . and obtain a declaration of rights, status or other legal relations thereunder." *Id.* § 6502.

As a general rule, "the plaintiff has the burden of proof in a declaratory judgment action." *Policemen's Annuity & Benefit Fund of Chicago v. DV Realty Advisors LLC*, 2012 WL 3548206, at *11 (Del. Ch. Aug. 16, 2012), *aff'd*, 75 A.3d 101 (Del. 2013). Plaintiffs must satisfy their "burden of proving each element . . . of each of their causes of action against [the] Defendant by a preponderance of the evidence." *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the

---

[221] Dkts. 176−177, 179, 194, 196.

43

more convincing force and makes you believe that something is more likely true than not." *Id.* (citation modified).

## B.     Contract Avoidance

Plaintiffs assert a cornucopia of arguments to avoid the Voting Agreement. They include: failure of contract formation, mistake, fraudulent inducement, and ethical violations of counsel.[222] And if all of those arguments fail, Plaintiffs contend the Voting Agreement must be interpreted as terminating after two years.

### 1.     Contract formation

"[A] valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). Whether the parties intended to be bound is determined objectively. *See Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229–30 & n.144 (Del. 2018). "[W]here the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound." *Id*. at 1230.

As to this element, "[c]onsideration requires that each party to a contract convey a benefit or incur a legal detriment, such that the exchange is 'bargained

---

[222] Pls.' Opening Br. 26–53; Pls.' Reply Br. 11–31.

for.'" *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 764 (Del. 2022) (citing *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 446 (Del. 1996)). "Contracting is a bargained-for exchange." *Pressman*, 679 A.2d at 446; *see also* Restatement (Second) of Contracts § 71(1) (1981) ("To constitute consideration, a performance or a return promise must be bargained for."). "If the requirement of consideration is met, there is no additional requirement of [] a gain, advantage, or benefit to the promisor or a loss, disadvantage, or detriment to the promisee." Restatement (Second) of Contracts § 79(a). A single bargained-for performance or promise may furnish consideration for multiple promises in return. *See* 3 Williston on Contracts § 7:54 (4th ed.); *see also* Restatement (Second) of Contracts § 80 & cmt. a ("Since consideration is not required to be adequate in value . . ., two or more promises may be binding even though made for the price of one. A single performance or return promise may thus furnish consideration for any number of promises.").

### a. The Voting Agreement is supported by consideration.

Plaintiffs contend that, if the Voting Agreement stands on its own, it lacks consideration and mutuality.[223] They characterize the actual trade as the removal of

---

[223] Pls.' Opening Br. 35−36; Pls.' Reply Br. 22.

the Board and a pathway for Hou's return as CTO.[224] Plaintiffs also suggest that Chen "gained nothing," urging the court to treat adequacy as part of the inquiry. Those arguments fail.

At the time of contracting, the parties acknowledged that the Voting Agreement was supported by consideration.[225] Although that recital is not outcome-determinative, it "facially supports a finding that the agreement is supported by consideration, absent facts suggesting that no such consideration was actually given or expected." *Moscowitz v. Theory Ent. LLC*, 2020 WL 6304899, at \*12 (Del. Ch. Oct. 28, 2020); *see* Restatement (Second) of Contracts § 87 cmt. c ("A recital in a written agreement that a stated consideration has been given is evidence of that fact as against a party to the agreement, but such a recital may ordinarily be contradicted by evidence that no such consideration was given or expected."); *id.* § 218 cmt. b ("A recital of fact in an integrated agreement is evidence of the fact, and its weight depends on the circumstances. Contrary facts may be prove[n]."); *id.* § 218 cmt. e ("Where consideration is required, the requirement is not satisfied by a false recital

---

[224] Pls.' Opening Br. 31; Pls.' Reply Br. 22–23.

[225] JX 169 at 1 ("In consideration of the mutual promises and covenants set forth herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.").

of consideration, although in some circumstances a recital of consideration may make a promise binding without consideration.").

The Voting Agreement is supported by consideration. A stockholder's promise to surrender discretionary voting and "vote[] as directed by the offeror" is itself valid consideration "personal to the stockholder." *Schreiber v. Carney*, 447 A.2d 17, 23 (Del. Ch. 1982); *see also id.* at 25 (describing Delaware's approach to voting agreements as liberal). That is precisely what the Voting Agreement does. Governance agreements are about allocating control, and consideration is inherent in that allocation. "[V]oting agreement[s] [are] supported by consideration personal to the stockholder, whereby the stockholder divorces his discretionary voting power and votes as directed by the offeror." *Id.* at 23. Stockholder agreements allow parties to "allocate control rights directly by contract," thereby enabling control sharing that would otherwise be difficult to achieve. Gabriel Rauterberg, *The Separation of Voting and Control: The Role of Contract in Corporate Governance*, 38 Yale J. Reg. 1124, 1140 (2021); *id.* at 1144 ("[O]ne reason that parties value the ability to contract over their votes [is that] it facilitates shareholders' ability to share control in ways that would otherwise be difficult to achieve."); *see also Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *16 n.49 (Del. Ch. July 21, 2000) ("[S]tockholders can bind

themselves contractually in a stockholders agreement in a manner that cannot be permissibly accomplished through a certificate of incorporation.").

Plaintiffs' contention that Chen gained nothing from the Voting Agreement is a quibble over the adequacy of consideration, not its existence. Adequacy of the consideration is irrelevant. Once there is a bargained-for exchange, courts do not police adequacy of consideration. Restatement (Second) of Contracts § 79; *see Osborn*, 991 A.2d at 1159 ("[W]e limit our inquiry into consideration to its existence and not whether it is fair or adequate. Mere inadequacy of consideration, in the absence of any unfairness or overreaching, does not justify a denial of . . . specific performance where in other respects the contract conforms with the rules and principles of equity.") (citation modified).

The same bargained-for exchange can support multiple contemporaneous promises. *See* Restatement (Second) of Contracts § 80. "[A]ll writings that are part of the same transaction are interpreted together." *Id.* § 202(2); *accord Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1081 (Del. Ch. 2021) ("'[C]ontemporaneous contracts between the same parties concerning the same subject matter should be read together as one contract.'") (quoting *Comerica Bank v. Glob. Payments Direct*, 2014 WL 3567610, at *7 (Del. Ch. July 21, 2014)). Here, the contemporaneous exchange transferred immediate voting control to Chen (via the Irrevocable Proxy) and bound Plaintiffs to vote as Chen directs in ongoing

corporate affairs (via the Voting Agreement). The same negotiated governance trade, *i.e.*, centralized voting control, supports both instruments.

Plaintiffs' arguments are premised upon the notion that the Voting Agreement is superfluous. The Irrevocable Proxy gave Chen the right to vote Hou's shares for two years. According to Plaintiffs, the Voting Agreement gave Chen the lesser right to require Hou to vote as Chen directed for the same two-year period. Were that so, then there would be no need for a Voting Agreement of the same duration.

Plaintiffs' theory then begs the question: Why did Hou, who was being advised by at least three law firms that reviewed the documents, sign a meaningless Voting Agreement? Neither Hou nor Plaintiffs have a persuasive explanation. The Voting Agreement reflects an objective intent to be bound, contains sufficiently definite obligations, and is supported by consideration. Therefore, the court will proceed to interpret the fully executed writings under Delaware's objective approach.

### b. Meeting of the minds

"[I]n the making of a contract . . . there must be a meeting of the minds of the parties." *Josloff v. Falbourn*, 125 A. 349, 350 (Del. 1924); *see also Eagle Force*, 187 A.3d at 1212 ("there must be a 'meeting of the minds' that there is a contract supported by consideration."). Delaware determines assent objectively. *See Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *18 (Del. Ch.

49

June 30, 2023), ("Under Delaware law, 'overt manifestation of assent—not subjective intent—controls the formation of a contract.'") (quoting *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014), *aff'd*, 328 A.3d 328 (Del. 2024). Where the alleged contract is a signed writing, "that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound." *Eagle Force*, 187 A.3d at 1230. Indefiniteness defeats contract formation only if the "terms in an agreement are so vague that a court cannot determine the existence of a breach" or fashion a remedy. *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) (citing *Haft v. Dart Grp. Corp.*, 877 F.Supp. 896, 906 (D. Del. 1995)); *see Indep. Cellular Tel., Inc. v. Barker*, 1997 WL 153816, at *4 (Del. Ch. Mar. 21, 1997); *Litle v. Waters*, 1992 WL 25758, at *6 (Del. Ch. Feb. 11, 1992) (each citing Restatement (Second) of Contracts § 33(2)). A "misunderstanding" negates assent only "if the parties attach[ed] materially different meanings to their manifestations and [] neither party kn[ew] or ha[d] reason to know the meaning attached by the other;" otherwise, the agreement is given the meaning of the party whose understanding was known or should have been known. Restatement (Second) of Contracts §§ 20(1)(a), 20(2)(b).

Plaintiffs argue that there was no mutual assent because Hou intended to grant voting authority for only two years.[226] They invoke *Kotler v. Shipman Associates, LLC*, 2019 WL 4025634 (Del. Ch. Aug. 21, 2019), arguing that the parties never agreed to the same terms. *Kotler* involved competing versions of a warrant negotiated amid a "haphazard" exchange of drafts, with parties' signature pages not attached to a single, common document. There, the court concluded that there was no objective manifestation that both sides assented to the same material terms, such as the scope and the duration of a non-compete provision. *Id.* at *16–18. The present case is distinguishable.

Objective manifestations of intent are controlling. Both the Irrevocable Proxy and the Voting Agreement are complete, unambiguous writings.[227] Plaintiffs have offered no contemporaneous document that supports a two-year term for the Voting Agreement. They point to informal statements (*e.g.*, post-signing text messages or statements Chen made at the September 2024 press conference), but they refer only to the Irrevocable Proxy and not to the Voting Agreement. These informal statements cannot vary clear contractual language that Plaintiffs received, reviewed,

---

[226] Pls.' Opening Br. 40; Pls.' Reply Br. 25. *See also* Pls.' Opening Br. 50−51 (advancing the theory that Chen's story is implausible and is a litigation-invented position not supported by contemporaneous evidence).

[227] Def.'s Answering Br. 35−36, 40−41.

and executed without objection.[228] To be sure, Hou's video memorializing the additions or revisions to the documents that he signed on November 9, 2022, made no mention of the Voting Agreement—a separate document that he had just signed. Had Hou intended the Voting Agreement to be limited to something other than what its unambiguous terms provide, he surely would have said so in the video.

The parties executed a single Voting Agreement, which contains an unambiguous termination clause requiring mutual agreement. This case is the opposite of *Kotler*, where the plaintiff failed to prove the existence of a contract because the parties never assented to the same version of a warrant agreement amid a "haphazard" exchange of drafts. *Id.* at *1. Here, there is one signed Voting Agreement; the Plaintiffs identify no competing executed version, no redlined document inserting a two-year limit, and no term sheet or email that includes a two-year term in that contract. Plaintiffs' reliance on a post-signing "Proxy Voting Agreement" label in Chen's November 15 Schedule 13D, which specified that the description did "not purport to be complete" and referred the reader to "the complete text" of the attached Voting Agreement and Irrevocable Proxy,[229] and on post-signing statements cannot vary an unambiguous writing. *See Coates v. Netro Corp.*,

---

[228] *Id.* at 37−40.

[229] JX 198 at 8, Item 3.

2002 WL 31112340, *4 (Del. Ch. Sept. 11, 2002) (holding that a proxy statement discussion of the terms of a certificate and bylaws was not misleading where the discussions "were qualified in their entirety by reference to the attached documents"); *see GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (reaffirming Delaware's objective theory and parol evidence rule, which provide that clear, unambiguous contract terms control and cannot be contradicted by extrinsic evidence).

The only instrument that objectively carries the two-year limit is the Irrevocable Proxy. The November 9 video identifies that document by title. Nothing shows that Chen knew or had reason to know that Plaintiffs attached a different meaning to the Voting Agreement's termination clause.

The parties manifested assent to the same Voting Agreement. The terms of the Voting Agreement are definite, and no contrary executed text imposes a two-year limit on that instrument. Therefore, the court concludes that there was a meeting of the minds on the Voting Agreement, and a contract was formed.

### c.     Mistake

Plaintiffs seek reformation of the Voting Agreement based on a mutual or unilateral mistake as to its duration. These arguments fail for the same reasons as Plaintiffs' "lack of consideration" and "no meeting of the minds" arguments failed.

Reformation is an equitable remedy that permits a court of equity to modify a written instrument so it reflects the parties' actual agreement when, because of fraud or mistake, the writing does not express their actual intent. "It is settled law that the equitable remedy of reformation may be used to express the 'real agreement' of the parties involved." *Libeau v. Fox*, 892 A.2d 1068, 1072 (Del. 2006) (citation modified). The party seeking reformation must demonstrate that the writing fails to accurately capture the parties' actual intent due to fraud, mutual mistake, or unilateral mistake coupled with the other party's knowing silence. "The Courts of this State have always insisted in reformation cases on a showing of mutual mistake or, in appropriate cases, unilateral mistake on plaintiff's part coupled with knowing silence on defendant's part." *Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980); *see also* 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.05 (2024).

To obtain reformation based on mutual mistake, Plaintiffs must prove by clear and convincing evidence that: (i) before execution, the parties reached a specific prior understanding on a material term, (ii) the written instrument failed to reflect that understanding because of a mistake, and (iii) the requested reformation would make the writing conform to that prior understanding. *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151–52 (Del. 2002). The clear and convincing evidence standard "'preserve[s] the integrity of written agreements by making it

difficult to modify executed contracts.'" *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724, at *10 (Del. Ch. June 4, 2018) (quoting *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *13 (Del. Ch. Oct. 20, 2015)); *see Off. Comm. of Unsecured Creds. of Motors Liquid. Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1015–16 (Del. 2014) ("As a matter of ordinary course, parties who sign contracts and other binding documents, or authorize someone else to execute those documents on their behalf, are bound by the obligations that those documents contain.").

### i. Mutual mistake

"To establish a mutual mistake of fact, the plaintiff must show by clear and convincing evidence that (1) both parties were mistaken as to a basic assumption, (2) the mistake materially affects the agreed-upon exchange of performances, and *(3)* the party adversely affected did not assume the risk of the mistake." *Hicks v. Sparks*, 89 A.3d 476, 2014 WL 1233698, at *2 (Del. Mar. 25, 2014) (TABLE).

Plaintiffs contend that if Chen "always intended" a perpetual Voting Agreement while Hou intended a two-year duration, then both sides were mutually mistaken. Plaintiffs rely on the November 9 video, Gunderson's drafting, and the Schedule 13D's reference to a "Proxy Voting Agreement."[230] But Plaintiffs have

---

[230] Pls.' Opening Br. 43–44; Pls.' Reply Br. 26–27.

not identified a single document supporting the conclusion that the pre-execution agreement specifically placed a two-year limit in the Voting Agreement. References to "proxy" in conversation do not establish a prior meeting of the minds to insert a two-year term into a different agreement with its own signature page and distinct termination provision. *See Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at \*19 (Del. Ch. Dec. 13, 2021) ("specific meeting of the minds regarding a term that was not accurately reflected in the final, written agreement must be shown") (citation modified).

Plaintiffs point to the descriptive language included in Chen's November 15, 2022, Schedule 13D, which referred to a "Proxy Voting Agreement" with a two-year duration. They then cite *Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, 854 A.2d 121 (Del. Ch. 2004), for the proposition that "Delaware law has long recognized that misleading partial disclosure can give rise to liability for the speaker where the same party could not be liable had he simply remained silent."[231] *See id*. at 130. But Plaintiffs' reliance on *Metro Communication* is misplaced. *Metro Communication* addressed common-law fraud by nondisclosure at the pleadings stage and turned on whether omitted facts rendered separate statements misleading. It did not authorize rewriting an otherwise clear, executed

---

[231] Pls.' Reply Br. 28.

contract. Here, Chen's Schedule 13D was filed six days after execution of the Voting Agreement. It also expressly directed readers to the attached agreements for their specific terms. Plaintiffs and their sophisticated counsel received drafts of the Voting Agreement before signing the fully executed versions on the day of signing, studied and discussed their implications, and raised no issues.[232] That course of performance is inconsistent with a shared, pre-execution understanding that the Voting Agreement would expire in two years. *See Glidepath*, 2018 WL 2670724, at *11–12 (noting that the clear and convincing standard guards against post hoc attempts to modify executed writings).

Plaintiffs also assert that Gunderson mistakenly omitted a two-year limit from the Voting Agreement and that Chen seeks to capitalize on the error. But Plaintiffs' own lawyers—not just one lawyer, but multiple lawyers from some of the most preeminent firms on planet earth[233]—received the drafts and the final signed agreements. None of them registered any concern that the express terms of the Voting Agreement were not what the parties intended. The Voting Agreement's termination clause is short, prominent, and unambiguously states that termination requires mutual agreement. If a two-year sunset on the Voting Agreement were an

---

[232] Tr. 166:16−167:1 (Song); JX 222 at 2.

[233] This includes one firm that boasts of being the "most feared firm in the world." JX 86 at 2; JX 115; JX 408.

agreed, material term, Plaintiffs' army of sophisticated lawyers would be expected to notice and address its absence before or at the time Hou signed it. *See Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 676–79 (Del. 2013) (recognizing reformation for scrivener's error or unilateral mistake with knowing silence but still requiring clear and convincing proof of the prior term and inequitable conduct).

Therefore, Plaintiffs have not proved by clear and convincing evidence a specific, pre-execution agreement to impose a two-year limit on the Voting Agreement that the executed writing failed to memorialize. The request for reformation on grounds of mutual mistake is denied.

### ii. Unilateral mistake

To obtain reformation based on a unilateral mistake, the party seeking reformation must prove both "that it was mistaken and that the other party knew of the mistake but remained silent." *Glidepath*, 2018 WL 2670724, at *12 (quoting *Scion*, 68 A.3d at 678). This argument fails for the same reasons as Plaintiffs' claim of mutual mistake.

Plaintiffs contend that Hou was mistaken in believing that the Voting Agreement carried a two-year limit, again relying upon the November 9 video and the November 15, 2022 Schedule 13D's "Proxy Voting Agreement" description.

They further assert that Chen knew or had reason to know of that mistake but said nothing.[234]

Plaintiffs did not prove unilateral mistake. The two-year term of the Irrevocable Proxy does not show Chen's awareness that Plaintiffs believed the Voting Agreement's termination clause was subject to the same term. Hou and his counsel received the documents on the execution date that unequivocally stated that the Voting Agreement would terminate upon the agreement of the parties, not before. Hou and his lawyers reviewed and discussed the Voting Agreement that day and never raised an issue then or at any time before filing this action nearly two years later. The Voting Agreement was publicly filed with the SEC and specified that any description of the Voting Agreement and Irrevocable Proxy was qualified by the terms of the two documents. Those facts undercut any suggestion that Defendant knew Plaintiffs labored under a contrary understanding yet stayed silent.

Plaintiffs have not shown by clear and convincing evidence that Chen knew that Hou mistakenly believed that the Voting Agreement would terminate in two years and remained silent. Reformation for unilateral mistake is therefore denied.

### d. Fraudulent inducement

The elements of fraudulent inducement are:

---

[234] Pls.' Opening Br. 45–46; Pls.' Reply Br. 28.

(1) a false statement or misrepresentation, usually one of fact, made by the defendant; (2) that the defendant knew was false or made with reckless indifference to the truth; (3) the statement was intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) the plaintiff was injured as a result of the reliance.

*Restanca*, 2023 WL 4306074, at *25. A party seeking to prove fraudulent inducement must do so by a preponderance of the evidence. *See Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *26 (Del. Ch. July 30, 2021), *aff'd*, 312 A.3d 1155 (Del. 2024), and *aff'd sub nom. Skinner v. Stone & Paper Invs., LLC*, 319 A.3d 270 (Del. 2024) (TABLE).

Plaintiffs contend Chen, through Lu and Alice, fraudulently induced Hou to sign the Voting Agreement after representing that the November 9 video "would address" the two-year issue, and that Hou would not have signed but for those representations.[235]

Plaintiffs have not carried their burden. First, the record does not identify an affirmative statement that the Voting Agreement would terminate in two years. Plaintiffs point to generalized assurances that the "video would address" the two-year issue. But the video discusses the "Irrevocable Proxy and Power of Attorney," which is the only instrument that objectively carries a two-year limit. It makes no mention of the Voting Agreement. Plaintiffs also cannot support their fraudulent

---

[235] Pls.' Opening Br. 47–48.

60

inducement claim with the description of the "Proxy Voting Agreement" in the Schedule 13D. As explained above, the Schedule 13D post-dates the execution of the Voting Agreement by six days and is qualified by the terms of the two agreements that were attached to the filing.

Second, scienter was not shown. Plaintiffs' theory posits that Chen knew the Voting Agreement was perpetual yet fostered a contrary impression. The drafting record, however, indicates that counsel focused on placing the two-year limit in the Irrevocable Proxy rather than in the Voting Agreement, as reflected in the executed papers.[236] That course is inconsistent with an intent to mislead about the Voting Agreement's duration. Plaintiffs cite no communication in which Chen, Alice, or Lu told Hou that the Voting Agreement itself would sunset in two years.

Third, justifiable reliance is lacking. Plaintiffs and their sophisticated counsel received the fully executed agreements on the day of signing; the Voting Agreement's termination clause is short and explicit, *i.e.*, termination occurs "by mutual agreement." Plaintiffs raised no contemporaneous objection after receiving the signed documents. On these facts, reliance on an asserted, extra-textual two-year limit for the Voting Agreement—contrary to the plain termination language— was not justifiable. *See Restanca*, 2023 WL 4306074, at *25 (requiring justifiable

---

[236] JX 164; JX 165; JX 169; JX 173; JX 174; JX 212; JX 213.

reliance). The same conclusion follows even if one credits Hou's deposition testimony at face value: there is no documentary support tying any pre-signing statement to the Voting Agreement's term, and the executed text was available for review.

Plaintiffs failed to prove a materially false statement about the Voting Agreement's term, scienter, or justifiable reliance. Therefore, the fraudulent inducement claim fails. The drafting and execution record instead shows that the two-year limit was implemented in the Irrevocable Proxy (as counsel worked to do), and the Voting Agreement bears an entirely different termination clause based on the mutual agreement.[237]

### e. Gunderson's alleged ethical violations

Plaintiffs advance a separate theory to challenge the contract's validity based on Gunderson's conduct. They argue that the Voting Agreement is void, voidable, or subject to reformation to a two-year term because of Gunderson's alleged unethical behavior.[238] They contend that Gunderson's conduct was central to the origination of this litigation and that Delaware courts should not condone it. Their specific allegation is that Gunderson engaged with a represented party without the

---

[237] JX 164.

[238] Pls.' Opening Br. 51−54.

consent or presence of Hou's attorney, in violation of professional responsibility rules in both California and Delaware.[239]

This contention focuses on Alice's presence at Hou's residence on November 9, a failure to contact Quinn, continued communications about legal issues with Hou, and the failure to involve Quinn when changing the date and officer designations as the core of the complained-of conduct.[240] They also argue that Gunderson changed the description in its invoices to conceal work performed for Chen personally.[241]

This late-blooming, made-for-litigation construct is unconvincing. Hou's attorneys understood the events of November 9 and raised no complaints. They reviewed all of the documents and identified no issues at the time of execution, after they were publicly filed, or before this litigation. Hou and his lawyers held a call on the evening of November 9 with Chen's lawyers at Gunderson and never mentioned any concern about a Gunderson lawyer or Lu being present at Hou's home.

---

[239] *Id.* at 52 (citing Rule 4.2 of the Delaware Lawyers' Rules of Professional Conduct ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.") and its California equivalent, California Rule of Professional Conduct 4.2).

[240] Pls.' Opening Br. 52.

[241] *Id.* at 53; JX 204; JX 332.

Plaintiffs rely on *In re Fuqua Industries, Inc. Shareholder Litigation*, 2006 WL 2640967, at \*8 (Del. Ch. Sept. 7, 2006), *aff'd sub nom. Abrams v. Sachnoff & Weaver, Ltd.*, 922 A.2d 414 (Del. 2007) (TABLE), and *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Company, Inc.*, 425 P.3d 1, 28 (Cal. 2018), to support reformation of the Voting Agreement or a declaration that it is unenforceable based upon an ethical violation. *Fuqua Industries* involved an entirely different scenario regarding an undisclosed fee-sharing arrangement between class counsel and a class representative. The court held that such an arrangement, undisclosed to the class and the court, was unethical and unenforceable because it struck at the structural safeguards of representative litigation. *Id.* at \*8–9. *Fuqua Industries* does not carry Plaintiffs' burden here. There, the offensive agreement was itself the instrument between the lawyer and the client. *See id.* at \*1, 7–8. Here, Plaintiffs ask the court to set aside or rewrite agreements between nonlawyers based on alleged violations of the rule barring counsel's contacts with a represented party during fast-moving events. A violation of Rule 4.2 of the Delaware Lawyers' Rules of Professional Conduct does not, standing alone, void an otherwise lawful agreement executed by a sophisticated party who, as the record shows, constrained his attorneys' representation.

*Sheppard* is similarly inapposite. There, the law firm agreed to represent a client in a federal qui tam action while concurrently representing the  client's

adversary in unrelated matters, without obtaining the client's informed written consent to waive the conflict. After the conflict was discovered and the law firm was disqualified from representing the client, the firm sued the client for unpaid fees and sought to compel arbitration under the engagement agreement. The arbitrator ruled in favor of the law firm, and the trial court confirmed the award. *Sheppard*, 425 P.3d at 5. The appeals court reversed, holding that the entire agreement was unenforceable because it violated the rules of professional conduct. *Sheppard, Mullin, Richter & Hampton, LLP. v. J-M Mfg. Co., Inc.*, 198 Cal. Rptr. 3d 253, 265–269 (Cal. Ct. App. 2016) *as modified on denial of reh'g* (Feb. 26, 2016), *review granted and opinion superseded sub nom., Sheppard, Mullin, Richter & Hampton v. J-M Mfg.*, 368 P.3d 922 (Cal. 2016), and *aff'd in part, rev'd in part*, 425 P.3d 1 (Cal. 2018). The California Supreme Court affirmed in part and reversed in part, holding that "the undisclosed conflict . . . render[ed] the engagement agreement unenforceable in its entirety." *Sheppard*, 425 P.3d at 28. Like *Fuqua Industries*, the alleged ethical breach in *Sheppard* involved an undisclosed concurrent conflict, which is a violation of ethical rules governing the attorney-client relationship and against public policy. The allegations that Plaintiffs raise here do not implicate an undisclosed conflict and do not go to the essence of the attorney-client relationship.

More generally, any effort to convert alleged violations of the Delaware Lawyers' Rules of Professional Conduct or the California Rules of Professional

Conduct into claims, defenses, or sanctions in this action is misplaced. The Delaware Supreme Court has held that "[t]he Rules are to be enforced by a disciplinary agency, and are not to be subverted as procedural weapons," and that "[a]bsent misconduct which taints the proceeding, thereby obstructing the orderly administration of justice, there is no independent right of counsel to challenge another lawyer's alleged breach of the Rules outside of a disciplinary proceeding." *Appeal of Infotechnology, Inc.*, 582 A.2d 215, 220−21 (Del. 1990); *see also Crumplar v. Superior Ct. ex rel. New Castle Cnty.*, 56 A.3d 1000, 1009 (Del. 2012) ("If a trial judge believes an attorney has committed misconduct, referral to the Office of Disciplinary Counsel . . . is the proper recourse in the absence of prejudicial disruption of the proceeding.").

Plaintiffs fail to make a showing of the elements required for reformation. They have not demonstrated that counsel obtained a signature by bypassing Hou's counsel in a way that tainted consent, or that any communication caused a misrepresentation, duress, or undue influence. Their inference from the redactions in Alice's messages is speculative. So is Plaintiffs' inference from the invoices. Nothing in the record establishes that the agreement memorializes an unethical client-lawyer bargain. And contemporaneous facts cut the other way: Hou had counsel; those lawyers were aware of the sequence of events; and Plaintiffs reviewed the documents without raising any objections. Even crediting Plaintiffs'

characterizations, the asserted violations do not supply a basis to void, reform, or time-limit the Voting Agreement. Accordingly, the court concludes that Plaintiffs have not met their evidentiary burden to succeed on this account.

## 2. Contract interpretation

Having dispensed with Plaintiffs' challenges to the existence and enforceability of the Voting Agreement, the court now turns to the meaning of that agreement. "Delaware adheres to the 'objective' theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn*, 991 A.2d at 1159 (Del. 2010). "When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG*, 36 A.3d at 779.

> [W]here [contractual] language at issue is clear and unambiguous. . ., the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language. But, where reasonable minds could differ as to the contracts meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence.

*Id.* at 783; *see also Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (holding that extrinsic evidence is used only if ambiguity exists).

### a. The Irrevocable Proxy and the Voting Agreement are two separate documents

The terms of the Voting Agreement reflect the best evidence of a shared bargain. *Eagle Force*, 187 A.3d at 1230. Those terms are unambiguous.[242] The duration of the Voting Agreement is not tied to the Proxy Agreement. Plaintiffs contend that the parties reached a unitary agreement in principle whose terms were memorialized across multiple writings and unwritten aspects, and that the writings were not fully integrated.[243] In their view, the absence of an integration clause or anti-reliance provision confirms the writings were not meant to be complete, and the Voting Agreement "never was meant to stand alone."[244] They add that the business context makes a unitary reading the only plausible one and that Defendant's construction yields an "absurd" result because the Irrevocable Proxy's exclusivity clause explicitly prohibits entering into a voting agreement.[245] They ask the court to consider the November 9 video and other extrinsic material as proof

---

[242] Post-Trial Arg. Tr. 46:16–18, 47:2–4.

[243] Pls.' Opening Br. 26.

[244] *Id.* at 26−27; Pls.' Reply Br. 15−17. At trial, Song testified that when the JP Morgan representative emailed her on January 24, 2023, she understood that the Irrevocable Proxy and the Voting Agreement were two separate agreements. Tr. 167:2−6 (Song).

[245] Pls.' Reply Br. 16−17; JX 212 at 2 ("Other than this irrevocable proxy and power of attorney, neither [of the White Marble's entities] shall . . . enter into a voting agreement or other similar understanding or arrangement with respect to the Subject Shares.").

that the writings were not the entire deal and that "proxy" was used loosely to refer to the whole arrangement.[246] Plaintiffs' arguments are without merit.

The Irrevocable Proxy and the Voting Agreement are distinct documents. The Irrevocable Proxy confers proxy rights for two years; the Voting Agreement is a contractual commitment to vote as directed thereafter on corporate affairs and dispositions.

The Plaintiffs' claim that there is no evidence differentiating the instruments is belied by the documents themselves: different titles, separate signature pages, distinct termination clauses, and provisions found in one but not the other (*i.e.*, the transfer mechanics only in the Irrevocable Proxy; specific performance only in the Voting Agreement). Subjective understandings cannot override objective manifestations. The executed writings control. The Irrevocable Proxy terminates on the earlier of two years from execution or mutual written termination. By contrast, the Voting Agreement terminates only by mutual agreement. This ends the inquiry. "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). The

---

[246] Pls.' Opening Br. 29, 31−35; Pls.' Reply Br. 15, 27; Post-Trial Arg. at 16:9−12.

Irrevocable Proxy and Power of Attorney and the Voting Agreement, and their respective termination clauses, are each clear and unambiguous.[247]

### 3. Breach of agreement due to failed reinstatement in the CTO position

Plaintiffs contend Defendant promised to reinstate Hou as CTO upon completion of an internal investigation and to change a draft board resolution to reflect that outcome. They point to the dialogue between Hou and Lu in the November 9 video:

> Hou: And the second matter is that the action by unanimous written consent of the board of directors of TuSimple Holdings Inc. We would like to amend this board resolution by adding another clause of appointing me, Xiaodi Hou, as the CTO of the Company condition[ed] on the completion of the internal investigation. Is that yours?
>
> Lu: Yes. I concur.
>
> Hou: Okay. Thank you.[248]

---

[247] Because the Voting Agreement is unambiguous, Plaintiffs' plea to apply the forthright negotiator principle to interpret the Voting Agreement is moot. *See Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) ("When making a determination regarding the 'shared intent' of the parties to an *ambiguous* contract, if a review of the extrinsic evidence does not lead the court to an 'obvious' conclusion, the court may apply . . . the 'forthright negotiator principle.'" (emphasis added)); *see also* Pls.' Reply Br. 29 (acknowledging that the forthright negotiator principle applies only "to the extent the Court cannot resolve any ambiguity by extrinsic evidence").

[248] JX 90 at 15−17; *see also* JX 135 at 1; JX 136 at 1; JX 144 at 1. JX 101 (emphasis added).

Hou argues that Chen breached this agreement in two ways: (1) he failed to cause a change to a draft board resolution, and (2) he did not reinstate Hou. Plaintiffs add that Chen told employees on multiple occasions that Hou would return.[249]

The Plaintiffs do not attempt to argue, legally or factually, how the breach of an oral agreement to reinstate Hou as CTO warrants reforming the Voting Agreement or declaring it unenforceable two years after the fact. Indeed, the issue was not identified as an issue for trial in the pretrial order or Plaintiffs' Pretrial Brief. Plaintiffs devote three paragraphs of their Post-Trial Opening Brief to this issue, which lack any citation to legal authority. The Defendant pointed this out in his Answering Brief, along with arguments on the merits, but Plaintiffs entirely ignored the issue on reply and did not raise it in post-trial argument.

Having failed to respond to the Defendant's arguments, Plaintiffs seem to have conceded the issue. *See Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *13 n.98 (Del. Ch. Sept. 28, 2015) ("Plaintiffs appear to have conceded this point by failing to address it in their reply brief."). But even if they have not conceded the point entirely, they have failed to provide a coherent argument that would justify a declaration that the Voting Agreement is unenforceable or must be reformed. "It is difficult to address th[is] theor[y] because [Plaintiffs] only

---

[249] Pls.' Opening Br. 48–49.

mentioned [it] briefly, did not develop the arguments, and did not provide any supporting [legal] authority . . . . A court need not address arguments that are presented in such a cursory and elliptical manner." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, *78 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021); *see also Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 n.12 (Del. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations and quotations omitted).

The argument also fails on the merits. The reinstatement term was expressly conditional on the completion of the "internal investigation."[250] The condition precedent is not satisfied because there is no evidence that the investigation has concluded.

To the extent that Plaintiffs are arguing that the Voting Agreement must be reformed or declared unenforceable for failure to reinstate Hou as CTO or to document the agreement to reinstate him in a Board resolution, the argument is waived for failure to develop it with legal and factual support. It also fails on the

---

[250] JX 101; JX 234.

72

merits because the alleged duty was expressly conditional, the condition did not occur (and was not excused).[251]

## III.  CONCLUSION

The Voting Agreement executed on November 9, 2022, is valid and enforceable. It terminates only upon the parties' mutual written agreement. The parties to the Voting Agreement have not mutually agreed that it is terminated. The parties shall confer on a form of implementing order consistent with this opinion, which shall be submitted within seven days.

---

[251] Because the Plaintiffs have failed to prove any of their claims, the court need not reach Defendant's affirmative defenses of ratification and acquiescence.